## LOEWER v. HARRIS.

(Circuit Court of Appeals, Second Circuit. August 1, 1893.)

1. DECEIT—SALE OF BUSINESS ENTERPRISE—CONCEALMENT OF PROFITS.
     Concealment by the owner of a business enterprise of a decline in its profits between the date of his agreement to sell and the signing of the contract of sale is actionable, when the purchaser has no opportunity of discovering the decline, and has agreed to buy on the faith of representations as to the prior rate of profit, having told the seller that he would not buy if there had been a decline.

2. SAME—PLEADING.
     In an action of deceit, an objection that plaintiff should have alleged a fraudulent concealment, instead of a fraudulent representation, will not be heard for the first time on writ of error.

3. SAME—DAMAGES—PLEADING.
     In an action for false representations made to the purchaser of a business enterprise, the charges of accountants employed by him to examine the books, and the fees of solicitors employed to organize a corporation to take over the business, must be specially alleged.

**4. SAME.**

The profits which the purchaser of a business enterprise would have made out of the transfer thereof to a corporation to be organized for the purpose of taking it are too uncertain to be recoverable by the purchaser in an action for fraudulent representations, inducing the purchase, although a syndicate had promised to underwrite the capital of the corporation, thereby, in effect, promising to subscribe all the capital not contributed by others, but had not entered into any definite or obligatory contract with the purchaser.

**5. EXCESSIVE DAMAGES—REMITTITUR.**

Where plaintiff, upon the findings of the jury, is entitled to recover a specific sum, but evidence of damage in a larger sum has erroneously been admitted, and judgment given for such larger sum, the plaintiff may, by filing a remittitur as to the excess, obtain an affirmance of the judgment.

In Error to the Circuit Court of the United States for the Southern District of New York.

At Law. Action by Harris against Loewer for false representations. Judgment was given for plaintiff. Defendant brings error. Affirmed on condition of a remittitur by plaintiff of part of the judgment.

C. J. G. Hall, for plaintiff in error.

Abel E. Blackmar, for defendant in error.

Before WALLACE and SHIPMAN, Circuit Judges.

WALLACE, Circuit Judge. This is a writ of error brought by the defendant in the court below to review a judgment for the plaintiff entered upon the verdict of a jury. The action was brought for damages arising from an alleged false representation made by the defendant to the plaintiff respecting the output and profits of the Gambrinus Brewing Company. The defendant had contemplated selling the brewing concern to a corporation to be formed in England for the purpose of acquiring it and carrying on the business, and in this behalf had entered into a contract with one Grant. The contract, in effect, gave Grant an option for a specified time to purchase the concern for $1,100,000, payable partly in money, and partly in the bonds and shares of the corporation; and within that time it was expected that he would organize the corporation, and perfect the transfer to it of the property and business. A prospectus had been prepared in July, 1890, for circulation, to induce subscriptions for shares, setting forth the features of the scheme, and containing statements relative to the past output and profits of the brewery. Among other things, it stated that the business had increased remarkably in volume and profit from year to year; that the output had been 38,357 barrels for the year 1887, 78,314 barrels for the year 1888, 95,555 barrels for the year 1889, and for the five months of 1890 (January 1st to June 1st) there had been an increase in the output over the corresponding period of 1889 of 2,732 barrels; that the profits for the last year's business were $128,237; and that these statements were based upon information supplied by the defendant, and contained in the reports of expert accountants who had examined the books

and accounts of the brewery for a period from April 1, 1888, to September 30, 1889. After the prospectus was prepared, the accountants reported the results of a recent examination of the business of the brewery made by them covering a period ending August 31, 1890; and this report showed a profit on the year's business of about $140,000. Grant failed to carry through the scheme within the time prescribed by the contract between the defendant and himself. Thereupon the plaintiff, who had to some extent been co-operating with Grant in London, came to New York, with a view of making an arrangement with the defendant for himself.

Evidence was given upon the trial tending to show that early in January, 1891, the plaintiff and defendant had an interview at the city of New York, and at that time substantially reached an understanding by which the plaintiff was to have an option to purchase the property upon the basis of the contract which had previously been made with Grant. He was to pay defendant $5,000 on the day when the contract of sale should be signed, and defendant was to receive all the bonds, shares, and cash on or before September 30, 1891. During that interview a copy of the prospectus of July, 1890, and of the last report of the accountants was produced, and the plaintiff asked the defendant if the brewery was still doing as well, telling him that the capitalization of the corporation would be based on the earning capacity of the business, and, if the profits were not as good as they had been, he would not want anything to do with it. The defendant said the figures of the prospectus and report were correct, and that the business was showing a gradual increase the same as it had done previously. The details of the proposed contracts were not fully adjusted until April 28, 1891, at which time the contract was signed, and plaintiff paid in the $5,000. After the January interview the parties did not meet. Between that time and the signing of the contract, the plaintiff was in London, trying to organize a syndicate to take over the property. He laid before the members the statements of the accountants showing the output and profits of the business to August 31, 1890, and told them that, at his interview with the defendant in New York, he had been informed by him that the profits of the brewery had shown a gradual increase up to that time, and they promised to underwrite the capital of the corporation. Shortly after the contract between the plaintiff and defendant was signed, the plaintiff had a further examination of the books of the brewery made by accountants, in order to obtain a statement of the output and profits from August 31, 1890, to the date of the contract, and their report was transmitted to him about May 20, 1891. This report disclosed that the output and profits of the business during the intervening period had not gradually increased, but, on the contrary, had materially diminished. The plaintiff informed the London syndicate of this report, and thereupon they declined to proceed any further with the enterprise. He then notified the defendant, and demanded the repayment of the $5,000. The evidence at the trial authorized the jury to find that

from August 31, 1890, the date to which the last report of the accountants had extended, to January 1, 1891, the output of the brewery was 28,094 barrels only, as against 31,193 barrels for the same period of the previous year; and that the average profits of the business for that four months were $5,430 per month, as against an average of $11,657 per month for the eleven preceding months.

Evidence was also introduced for the plaintiff, and received against the objection of the defendant, showing that, during the three months which elapsed between the interview at which the alleged false representation was made and the signing of the contract, the output was 14,947 barrels, as against 17,128 barrels for the same period of the preceding year, and that there was a greater proportionate decrease in the profits than in the output for that period.

Evidence was also received for the plaintiff, against the objection of the defendant, showing that the underwriting of the syndicate would have cost the plaintiff $82,250; that the promise to underwrite by the syndicate was in substance a promise to subscribe for all the capital of the corporation not contributed by others; that the plaintiff had expended $500 for solicitors' services in respect to the organization of the company, and had paid $1,000 to the accountants for their charges for the examination of the books of the brewery made after the date of the contract with the defendant; and that, if the enterprise had been carried through, the plaintiff would have made a profit out of it, above expenses, of about $93,000.

After the testimony was closed, the defendant moved the court, in substance, to instruct the jury to disregard the evidence of the output and profits or loss for the months of January, February, and March, 1891, because they were for a period subsequent to the time at which the alleged fraudulent statement was made; that, in considering the evidence, they should not give any effect to the fact that the defendant did not voluntarily inform the plaintiff that the output or profits of the brewery had fallen off after the time of the interview between the parties; that it was not the duty of the defendant to disclose the fact to the plaintiff that the output and profits had decreased after the date of the interview; and that the jury should disregard the claim for damages by reason of the profit the plaintiff would have made if the enterprise had been carried through in London, because the basis for any such damages was too speculative and problematical. The court refused to instruct the jury as thus requested, and the defendant excepted. The judge instructed the jury that they were to determine as questions of fact whether the defendant made the statement attributed to him at the time of the interview, whether the plaintiff relied upon it, and, if made, whether it was false at the time. He then instructed them, in substance, as follows: That it appeared, without any contradiction, that between the time of the interview, when it was alleged the false representation was made, and the signing of the contract, there

had been a very large shrinkage both in the amount of the business and the profits which it was earning; that, while the defendant need not have disclosed to the plaintiff anything in respect to the condition of the business, if he undertook to make any representation as to what its condition was he was bound that such representation, was truthful when made; and that, in view of the fact that this inchoate arrangement continued over several months, while the precise terms of the contract were being formulated and reduced to writing, if the situation materially changed for the worse after the defendant made the representation, he was bound in good faith, and before he let the plaintiff sign the contract, and took his money, to call the plaintiff's attention to the fact that the situation was not as he had theretofore represented it to be.   He proceeds as follows:

"Now, that leaves open for your consideration the situation of the business as it is shown to have been subsequent to the date of the interview; but you must be extremely careful to understand that the defendant was not under any obligation to disclose the unfortunate condition of the business after the interview, unless he had represented at that time that the business was doing substantially as well as previously. If you are not satisfied that the defendant made such a statement at the interview with plaintiff, then you are not to go into the condition of the business subsequently, because the defendant was under no obligation to volunteer any statement about its condition at all, and, unless he made a statement at the interview, was under no obligation to modify it in any way, or to make any further statement about its condition at any subsequent time."

He also instructed them that, if they found for the plaintiff upon the questions of fact submitted to them, the plaintiff was entitled to recover the $5,000 paid by him at the time the contract was signed, with interest; that he was also entitled to recover the sums paid out by him to the solicitors and the accountants; and that the jury were to determine what, if any, damages the plaintiff sustained by reason of any loss of profits which he would have made if the new corporation had become the purchaser of the property. The only exceptions by the defendant to the instructions given were as to those in respect to the amount of damages.   The jury found a verdict for the plaintiff for $8,741.67.

The principal assignments of error are based upon the admission of the evidence tending to show the decrease of outputs and profits between the time of the representation and the signing of the contract; upon the admission of the evidence in respect to the sums expended by the plaintiff for solicitors' and accountants' charges; upon the admission of the evidence respecting profits the plaintiff would have made if the London corporation had purchased the property; upon the rulings of the judge upon the question of damages; and upon the refusal of the judge to instruct the jury as requested by the defendant.

We do not deem it necessary to notice the assignments of error which rest upon the proposition that the court should have taken the case from the jury, because the evidence did not establish that a false representation had been made by the defendant, or that the

plaintiff relied upon it. There was sufficient evidence upon both of those issues, not only to authorize, but require, the judge to submit the cause to the jury; and, if the verdict was against the weight of evidence, this court has no power to disturb it.

There is no merit in the assignment of error based upon the rulings of the court in admitting evidence of a decrease of output and profits intermediate the time of the representation and the signing of the contract, or the rulings as to the effect of that evidence, and the duty of the defendant to inform the plaintiff of the facts. It is an elementary proposition in the law of fraud that, if one party to a contract knowingly assists in inducing the other to enter into it by leading him to believe that which he himself knows to be false, his conduct is fraudulent, and it matters not whether the result is brought about by misrepresentation or by keeping silent when duty requires a disclosure. As was said in French v. Vining, 102 Mass. 135:

"Deceit may sometimes take a negative form, and there may be circumstances in which silence would have all the legal characteristics of actual misrepresentation."

The law requires disclosure to be made only when there is a duty to make it, and this duty is not raised by the mere circumstance that the undisclosed fact is material, and is known to the one party, and not to the other, or by the additional circumstance that the party to whom it is known knows that the other party is actually in ignorance of it; but when one of the parties, pending negotiations for a contract, has held out to the other the existence of a certain state of facts, material to the subject of the contract, and knows that the other is acting upon the inducement of their existence, and, while they are pending, knows that a change has occurred, of which the other party is ignorant, good faith and common honesty require him to correct the misapprehension which he has created. It becomes his duty to make disclosure of the changed state of facts, because he has put the other party off his guard. The doctrine is thus stated by Mr. Pollock, in his work Principles of Contracts, (page 491:)

"It is sufficient if it appear that the one party knowingly assisted in inducing the other to enter into the contract by leading him to believe that which was known to be false. Thus it is where one party has made an innocent misrepresentation, but, on discovering the error, does nothing to undeceive the other."

The representation made by the defendant respecting the output and profits of the business, if made at all, was made in response to an inquiry of the plaintiff, coupled with the statement that he would not want to have anything to do with the transaction if the profits were not as good as they had been, and that the capitalization of the corporation would be based on the earning capacity of the business. The defendant understood that the inquiry and answer were addressed to the condition of things which might be relied upon by the plaintiff as the basis of the contract which was thereafter to be formally concluded. As it turned out, a period

of several months elapsed before the contract was executed, during which the plaintiff was absent from the country, and had no means of informing himself of the real state of affairs. Under such circumstances, it cannot be doubted that, when the defendant discovered that the conditions of the business were not as he had led the plaintiff to suppose them to be, it was his duty to inform him of the facts, and, by maintaining silence when he should have spoken, he was guilty of deceit.

It has been urged that the complaint proceeds only upon the allegation of a false representation, and does not aver a fraudulent concealment, but no such objection was taken upon the trial. If such an objection had been raised, it would have been within the discretion of the court to allow an amendment of the complaint.

It is apparent from the amount of the verdict that the jury allowed damages for the expenses incurred by the plaintiff for solicitors' fees and accountants' charges, and also to some extent for the loss of profits. The complaint does not allege special damages, and the objection by the defendant to a recovery for the item expended for solicitors' and accountants' charges was put upon that ground. This objection was well taken. General damages are such as necessarily result from the injury complained of, and may be recovered without a special averment in the declaration. But such damages as, although the natural, are not the necessary, result of a wrong or breach of contract, are special, and must be stated in the declaration. Roberts v. Graham, 6 Wall. 578; Vanderslice v. Newton, 4 N. Y. 130.

We are also of the opinion that the jury should have been instructed to disallow any damages arising from the loss of expected profits. The plaintiff had not entered into any binding contract with the members of the syndicate by which he would have had any right of recourse against them in case of their failure or refusal to procure the capital for the corporation, nor, so far as appears by the evidence, had the transaction with them taken any such definite or obligatory form as to preclude him from receding from it, and making new arrangements with others. The fruition of the scheme was wholly dependent upon the raising of the capital necessary to enable the corporation to take over the property. It was therefore merely a matter of conjecture whether he would have realized any profits. It is not enough that the damages which may be recovered for a wrong or breach of contract are proximate, in the sense that they are such as the wrongdoer must have contemplated as the probable consequence of his misconduct; they must also be certain, in the sense that they are not problematical. Speculative and merely possible damages are not recoverable.

Inasmuch as, upon the findings of the jury, the plaintiff was clearly entitled to a verdict for the sum of $5,000, with interest from April 28, 1892, and the erroneous rulings upon the trial were only injurious to the defendant to the extent that additional damages were allowed by the jury, the case is a proper one for permitting the defendant in error to remit the excessive recovery. Bank

v. Ashley, 2 Pet. 327. If the plaintiff chooses to remit, the judgment will be affirmed; otherwise, it must be reversed.

The judgment is reversed, unless, within 20 days, the defendant in error enters a proper remittitur, and pays the costs of the writ of error; and, if he does so, the judgment will be affirmed.