GOLDSMITH v. KOOPMAN et al.

REIZENSTEIN v. SAME.

(Circuit Court, S. D. New York. August 2, 1905.)

Nos. 7,175, 7,176.

1. PATENTS—ASSIGNMENTS—VALIDITY—CANCELLATION.

One of the complainants obtained patents for an invention in this country and Europe, and assigned a half interest in the foreign patents to the complainant in the second suit. They afterwards became associated in the ownership of the foreign . patents with defendants and others, each complainant retaining a fourth interest. A fund was raised, and a representative sent to England, who negotiated profitable license contracts. This fact was concealed from the complainants, and, by means of representations to them that the efforts had so far been unsuccessful, and demands for further advances, at a time when large payments had been actually received under the foreign licenses, they were induced to transfer their property interests to defendants for a small sum. Held, that such facts constituted a fraud upon complainants, which entitled each of them to a cancellation of his assignment, and to recover his share of the profits realized from the joint venture, with interest.

[Ed. Note.—Sublicenses and assignments of licenses for use or sale of patents, see note to National Phonograph Co. v. Schlegel, 64 C. C. A. 596.]

2. FRAUD—RECOVERY OF DAMAGES—PERSONS LIABLE.

A defendant who was an active participant in a scheme by which complainants, with whom he was in close and confidential business relations, were fraudulently induced to make a transfer of their property, cannot escape liability to make restitution on a cancellation of the transfer, on the ground that he did not himself profit by the fraud.

In Equity.

Eugene Treadwell, Isaac Hassler, and Harrison B. Weil, for complainants.

Herman Aaron, Francis T. Homer, and Henry M. Brigham, for defendant Koopman.

Luther Shafer, for defendants Upton's executors.

PLATT, District Judge. These are similar suits, brought by the respective complainants against their partners, to set aside a transfer

of complainant's interest on the ground of fraud, to declare each complainant to be the owner of a one-fourth interest in the joint enterprise and in the profits growing out of it, and to require the defendants to pay over such share or interest, if the same be ascertainable, or to order an accounting if it be not. The defendant Koopman denies that any transfer was made to him, denies any fraudulent representations or concealment of pertinent facts which induced the transfer, and claims that the complainants are limited in recovery, or cannot recover at all, by reason of an alleged license agreement made by the copartnership long prior to the transfer which it is sought to set aside. The answer of the executors of the deceased partner, Charles S. Upton, admits his death and their appointment, but denies any knowledge or information by said defendants of or concerning other allegations in the bill contained.

It is possible to treat both cases together, and what shall be said herefrom will be understood to contain some of the reasons for the action which will follow.

Complainant Goldsmith in 1890 obtained letters patent for a pocket savings bank in the United States, England, and continental countries. Pending the applications, he assigned to complainant Reizenstein an undivided one-half interest in the foreign patents, and licensed the Magic Introduction Company to manufacture and sell banks under the United States patent. Defendant Upton was president of the Magic Introduction Company, and defendant Koopman was treasurer and manager. Henry M. Brigham was a patent lawyer in New York of some experience. When the United States patent issued, Mr. Brigham thought its claims too narrow, and prepared a model bank, to avoid infringement, applying for a patent thereon November 26, 1890. This was transferred to the Magic Introduction Company. Goldsmith was forced on that account to reduce his royalties, and the patent was then transferred to him. Brigham, at the same time, obtained his interest in the foreign patents by threats of patenting his United States patent abroad and using it in competition. Koopman also got a one-fourth interest in the foreign business by promising active assistance and co-operation in marketing the goods abroad. On January 20, 1891, therefore, an agreement was made between Goldsmith, Reizenstein, Koopman, and Henry M. Brigham, pooling the foreign patents, and fixing the interests at one undivided fourth each, including all future inventions. Goldsmith, to avoid foreign complications like those domestic already incurred, applied through English solicitors, selected by Koopman, and obtained on March 31, 1891, a second English patent, with more specific claims. In the meantime, capital was essential, and an agreement was entered into April 11, 1891. Goldsmith, Reizenstein, and Koopman kept their original one-fourth each, but Brigham's fourth was divided; Henry M. Brigham taking one-eighth, and Charles S. Upton and John H. Brigham each one-sixteenth, and $2,000 was subscribed, each contributing according to his interest, the profits and losses to be in the same ratio. The purpose of the copartnership was to manufacture and sell, and to license others to manufacture and sell, the inventions in the foreign countries. John H. Brigham was to

visit London in the interest of the copartnership, at a fixed salary to continue for one year. A few days later, Willard S. Upton, a brother of Charles S. Upton, was employed as a salesman, to help John H. Brigham in the foreign markets with the patented device. Henry M. Brigham prepared all the papers. Reizenstein, Willard S. Upton, and John H. Brigham, on April 14, 1891, went to Europe together in the interests of the copartnership. Charles S. Upton, as president of the Rochester Lamp Company, had come to know in a business way Wright & Butler of Birmingham and John G. Rollins & Co. of London. John H. Brigham knew them, because he had been acting as salesman for the Rochester Lamp Company, but nothing was known of these firms by either Goldsmith or Reizenstein. On arrival in England, John H. Brigham, who was vice president of the Rochester Lamp Company, immediately began negotiations with Wright & Butler and Rollins & Co., representing himself to them as having the sole right to sell, and license others to sell, Goldsmith's invention. He did not tell Reizenstein what he was doing, and concealed entirely from him the progress of the negotiations during all the time Reizenstein remained abroad. He also told Reizenstein that nothing could be done in the way of business for the copartnership, until at length Reizenstein lost heart and went home, completely discouraged. On May 6th, however, affairs between John H. Brigham and Wright & Butler had culminated in an agreement in which John Harris Brigham poses as the sole licensee under the English patents, and undertakes to license Wright & Butler to sell the banks at a specified royalty. Brigham and Upton also began negotiations with Rollins & Co. On May 22d a further agreement with Wright & Butler, in which John Harris Brigham still poses as sole licensee, was entered into. Both of these agreements and the negotiations with Rollins & Co. were concealed from Reizenstein. On May 5, 1891, John H. Brigham got from Reizenstein, who was ignorant of the above doings, but hopeful of the future, his own signature to an agreement making the said Brigham the sole licensee. In the latter part of May, Reizenstein and John H. Brigham returned home, reaching here early in June, 1891. A conference of the partners followed. Charles S. Upton had signed, and Goldsmith was asked to sign. He was not told about the transactions with Wright & Butler and Rollins & Co. The plan suggested was urged as the only means of continuing efforts abroad, and Goldsmith at last signed, but Koopman refused to sign, and complainants went back to Philadelphia, believing that the license agreement with John H. Brigham was of no value, since it must be signed by all the parties. After they had gone, Koopman and Henry M. Brigham refused to sign, unless they could have the same shares under the John H. Brigham license as under the existing pool, to wit, one-fourth to Koopman and one-eighth to Henry M. Brigham. Finally, they agreed to unite all the interest held by them in the patents under the copartnership agreement, and all the interest which would vest in John H. Brigham under the license agreement, and they formed a joint pool for that purpose, consisting of Koopman, Upton, Henry M. Brigham, and John H. Brigham. Goldsmith and Reizenstein were not told about this.

The members interested called it "Pool No. 2," and it was transferred to the New York Introduction Company, in which only sixteen shares were issued, held in the same proportion as in the pool. Before complainants went back to Philadelphia, it had been arranged that Koopman should go to Europe in the interest of the old pool. He went, and using the agreement in which John H. Brigham was sole licensee, profitable arrangements were made with Wright & Butler and Rollins & Co., and, although some clashing transpired, it resulted that on September 30, 1891, a final agreement was made, through Koopman, with Wright & Butler, modifying all former agreements, and producing a large payment of cash and certainty of more to come. On September 30, 1891, information about this last transaction with Wright & Butler was cabled by Koopman to the office of the New York Introduction Company, into which pool No. 2 had just been merged, and from which the complainants had been excluded, as heretofore explained.

I find, as a fact, that prior to October 2, 1891, the date of the transfer sought to be set aside, every member of the copartnership except Goldsmith and Reizenstein, the complainants, had learned that at least $31,000 in cash had been received on account of the Goldsmith patents from Rollins & Co. and Wright & Butler, with an additional $10,000 soon to be paid by Wright & Butler in equal monthly installments. All the other members of the pool except Goldsmith and Reizenstein knew also of existing agreements with other parties, which before November 7, 1891, yielded additional cash to an amount of over $9,000. On October 2, 1891, Goldsmith and Reizenstein were called from Philadelphia to New York by Joseph E. Kronheimer, on account of important matters connected with the foreign bank business. Kronheimer was the partner and business representative of Koopman in all the latter's business affairs, including the pocket savings banks. Koopman and Kronheimer were also close friends, living together, and sharing personal expenses. Upon reaching New York, Goldsmith and Reizenstein met Kronheimer at the office of the Magic Introduction Company, and went with him to the store of Charles S. Upton on Barclay street. Charles S. Upton told them that Kronheimer had sent for them because the copartnership needed more money; that it was in debt; that no business had been done abroad; that $5,000 of new capital was needed to pay the debts and keep up the foreign business; and that since they each held a one-fourth interest, they should each put up $1,250. Complainants asked Mr. Upton particularly about the foreign business, and he told them that nothing had been done, and the prospects were uncertain. Complainants naturally demurred to the payments suggested, and Upton repeated the statements that nothing had been done abroad; that the copartnership was deeply in debt, and needed money. Complainants, still hesitating, asked Upton if he thought they would be likely to get their money back if they should put it in. Upton replied that he did not know; that the future was very doubtful and uncertain, and they must chance it. After further dilly-dallying, Upton at last broke forth with the proposition that it was a case of "put up or shut up"; that they must

contribute the money, or get out of the concern; that he and Koopman would buy them out; and, after some dickering, agreed to pay them $875 each in full of all demands. Complainants then sought counsel of Kronheimer, whom they knew as Koopman's partner and friend, and in whom they had personal confidence. Kronheimer corroborated Charles S. Upton in every detail. Upton and Kronheimer both stated that they had heard from Koopman, and that he had not been able to do any business. At last Goldsmith and Reizenstein accepted the offer. The agreement which it is sought to cancel was drawn by the ever present and ever serviceable Henry M. Brigham, and presented to and signed by the complainants. It was also signed by Charles S. Upton and by Kronheimer as attorney for Elias B. Koopman, although, so far as appears, the paper need not have been so drawn as to require those signatures. Goldsmith and Reizenstein noticed the reference in the agreement to the John H. Brigham license, and asked Charles S. Upton and Kronheimer what that meant. They were told that it was simply a matter of form; that they wished to buy an unclouded title, and, as complainants were disposing of their original interest, it could make no difference. They then signed the paper, and returned to Philadelphia.

It may be well to say right here that it seems to make no difference whether they knew that the license agreement to John H. Brigham had been made operative or not. I am satisfied that the license agreement was not signed by Koopman until after he had made all his interests absolutely impregnable; but, if he had signed it, the important fact that value had been acquired for the foreign patent interests through Wright & Butler and Rollins & Co. was kept away from the complainants at the time Koopman refused to sign and thereafter. This situation, in and of itself, makes the license agreement null and void so far as the complainants are concerned, and removes any vestige of defense which defendant Koopman seeks to present based upon that agreement. They knew nothing more until about a year later, when they met Koopman, and asked in a general way about the pocket bank business. Koopman told them it had been a success, and that money had been made, but naturally the complainants supposed that success had reached the copartnership after their transfer. The complainants remained unknowing and quiescent until 1898, when, after the failure of the Magic Introduction Company, Goldsmith learned through an official of that company about certain contracts. That official (Albert Behrend) subsequently found a copy of the Wright & Butler contract of September 30, 1891. Mr. Goldsmith took this copy to his counsel, and, after investigation, the present suit was brought.

Upon this statement of such facts as seem to the court important, the case against Upton's executors is established beyond peradventure. The complainants fell into a nest of scorpions, and by divers and sundry devices were finally, for the paltry sum of $375, in addition to their original venture, stripped of all right, title, and interest in and to large sums of money then in hand, all of which grew out of Goldsmith's invention, and one-half of which the complainants were between them entitled to enjoy. Charles S. Upton took

a personal, active, and intense interest in the consummation of the fraud. Elias B. Koopman did not happen to be on hand at the moment, but is impossible to escape the conclusion that if his personality shall be subtracted from the equation the fraud would have failed of its purpose. Slowly, but steadily, the coils of this conspiracy tightened about the complainants. Koopman was an essential factor in that tightening. He knew a great many things which it was necessary to keep from the complainants to make the fraud successful. He was in the closest confidential business relation with the complainants. His silence cannot be excused as accidental. He refrained from speaking when he knew that his silence must work the greatest harm to the complainants. His final excuse is that, although it is true that complainants were fleeced most scientifically of their property, he cannot be held accountable because the books show that he gained nothing by the transaction, and there is no proof that they are incorrect. I cannot consent to the inference that Koopman made nothing out of this adroit scheme of spoliation, in connection with which his active participation was an essential feature. Admitting that to be so, however, he cannot escape under the authorities as I read them. The complainants have been damaged to their hurt, and the defendant Koopman was a factor therein. That is the gravamen of the charge; not that defendant Koopman has gained, but that complainants have lost by his fault.

I have so little patience with the attempted defense that under the foreign contracts only 10,000 banks were sold which came under the Goldsmith English patent, that I deem it wiser to say that it is frivolous, and let it go at that.

To what relief are the complainants entitled? (1) The transfer of October 2, 1891, should be canceled. (2) Each complainant is entitled to the one-quarter interest in all the profits of the business, with interest thereon from August 3, 1892, the date of the last payment by Wright & Butler or Rollins & Co. (3) Upon the proofs, such interest appears to be $12,315.71, upon which interest, as suggested, shall be computed. (4) Such amount shall be entered up for each complainant in his particular suit, and shall run against the defendants in each suit jointly and severally. The amounts to be entered up are the minimum amounts, but they can be clearly deduced from the proofs, and, as complainants waive any further recovery, it is unnecessary to take the assistance of a master.

Let decrees be drawn in accordance with this opinion.