Stephen **FISCHER** et al., Plaintiffs,

v.

Michael **KLETZ** et al., Defendants (and fifteen other actions consolidated therewith).

No. 65 Civ. 787.

United States District Court
S. D. New York.

April 5, 1967.

Pomerantz, Levy, Haudek & Block, New York City, for plaintiffs.

Kaufman, Taylor, Kimmel & Miller, New York City, for plaintiffs.

Phillips, Nizer, Benjamin, Krim & Ballon, New York City, for defendant Peat, Marwick, Mitchell & Co.

Securities and Exchange Commission, Washington, D. C., amicus curiae.

## OPINION

TYLER, District Judge.

In October, 1966, plaintiffs in this class action [1] moved against defendant Peat, Marwick, Mitchell & Co. ("PMM") for further discovery under Rule 34, F.R. Civ.P., based in part upon the allegations set forth in paragraphs 25 through 25.3 of the second consolidated amended complaint (hereinafter "the complaint"). PMM opposed this motion, and, in addition, cross-moved against the plaintiffs, pursuant to Rule 12(b) (1) and/or 12(b) (6), F.R.Civ.P., for an order by this court dismissing paragraphs 25–25.3 of the complaint on the grounds that the court has no jurisdiction over the subject matter contained therein and/or that the allegations of these paragraphs fail to state a claim upon which relief can be granted. Plaintiffs and the Securities and Exchange Commission ("SEC"), which has filed an *amicus curiae* brief, strenuously oppose the cross-motion.

The discovery motion was disposed of by this court in a memorandum opinion, dated November 1, 1966; this opinion will deal with PMM's cross-motion to dismiss paragraphs 25–25.3 of the complaint.

For the purposes of this motion, the parties agree in principle that the facts urged upon the court by the plaintiffs must be accepted as true and that the challenged portions of the complaint must be upheld if they are supported by any viable rule of law. There follows a summarization of the facts which reasonably can be read from the formal complaint allegations, particularly those under fire in this motion.

Sometime early in 1964, PMM, acting as an independent public accountant, undertook the job of auditing the financial statements that Yale Express System, Inc. ("Yale"), a national transportation concern, intended to include in the annual report to its stockholders for the year

---

1. For other published opinions dealing with this controversy, see D.C., 249 F.Supp. 539 (Jan. 13, 1966) (denial of motion to dismiss or, in alternative, for stay pending resolution of certain factual determinations by ICC) and D.C., 41 F.R.D. 377 (Dec. 8, 1966) (determination that a class action can be maintained).

ending December 31, 1963. On March 31, 1964, PMM certified the figures contained in these statements. On or about April 9, the annual report containing the certification was issued to the stockholders of Yale. Subsequently, on or about June 29, 1964, a Form 10–K Report, containing the same financial statements as the annual report, was filed with the SEC as required by that agency's rules and regulations.

At an unspecified date "early in 1964", probably shortly after the completion of the audit, Yale engaged PMM to conduct so-called "special studies" of Yale's [past and current income and expenses. In the course of this special assignment, sometime presumably before the end of 1964,[2] PMM discovered that the figures in the annual report were substantially false and misleading.

Not until May 5, 1965, however, when the results of the special studies were released, did PMM disclose this finding to the exchanges on which Yale securities were traded, to the SEC or to the public at large.

Furthermore, during the course of PMM's special studies, Yale periodically announced to PMM an intention to issue several interim statements and reports to show the company's 1964 financial performance. In at least two instances, Yale was told by PMM that figures derived from the special studies could not be used as a basis for these interim statements; in addition, PMM recommended that the figures developed by Yale through its internal accounting procedures be used in the reports.

Yale thereupon issued several interim statements containing figures which were not compiled, audited or certified by PMM. As in the case of the annual and SEC reports, later developments revealed that the figures contained in these interim statements were materially false and misleading.

Plaintiffs allege that, from the compilation of figures for 1964 and its knowledge of the contents of the interim reports, PMM knew that the figures contained in those statements were grossly inaccurate. No disclosure of this finding has yet been made to the exchanges, the SEC or the public.

Within this alleged factual context, the plaintiffs assert that PMM is liable in damages for its failure to disclose not only that the certified financial statements in the 1963 annual report contained false and misleading figures but also that the interim statements issued by Yale were inaccurate. Because the bases for such claimed liability are grounded on distinctly different legal theories, the issues unique to each area will be discussed and analyzed separately.

## I.
### ANNUAL REPORT LIABILITY

Plaintiffs attack PMM for its silence and inaction after its employees discovered, during the special studies, that the audited and certified figures in the financial statements reflecting Yale's 1963 performance were grossly inaccurate. They contend that inasmuch as PMM knew that its audit and certificate would be relied upon by the investing public,[3] the accounting firm had a duty to alert the public in some way that the audited and certified statements were materially false and inaccurate. PMM counters that there is no common law or statutory basis for imposing such a duty on it as a public accounting firm retained by the officers and directors of Yale.

Strict analysis leads to the conclusion that PMM is attacked in the complaint because it wore two hats in conducting its business relations with Yale during the period in question. PMM

2. There is a factual dispute here. PMM maintains that the falsity of the figures was discovered after the filing of the required 10–K report with the SEC on June 29, 1964; plaintiffs contend that the discovery was made before this filing.

3. The several issues involving reliance can be finally resolved only when the facts are more fully, if not completely, developed.

audited and certified the financial statements in the 1963 annual report and Form 10–K as a statutory "independent public accountant" [4] whose responsibility "is not only to the client who pays his fee, but also to investors, creditors and others who may rely on the financial statements which he certifies. * * * The public accountant must report fairly on the facts as he finds them whether favorable or unfavorable to his client. His duty is to safeguard the public interest, not that of his client. (In the Matter of Touche, Niven, Bailey & Smart, 37 S.E.C. 629, 670–671 (1957)) (footnotes omitted)

Following the certification, PMM switched its role to that of an accountant employed by Yale to undertake special studies which were necessitated by business demands rather than by statutory or regulatory requirements. In this sense, it can be seen that during the special studies PMM was a "dependent public accountant" whose primary obligations, under normal circumstances, were to its client and not the public.

■ It was, of course, during the conduct of the special studies that the inaccuracies in the audited and certified statements were discovered. The time of this discovery makes the questions here involved difficult and unique. On the basis of the Commission's *Touche, Niven* opinion, an accountant has a duty to the investing public to certify only those statements which he deems accurate. This duty is not directly involved here, however, for the inaccuracies were discovered after the certification had been made and the 1963 annual report

had been released. PMM maintains, therefore, that any duty to the investing public terminated once it certified the relevant financial statements. Plaintiffs, of course, contend to the contrary. Thus, the serious question arises as to whether or not an obligation correlative to but conceptually different from the duty to audit and to certify with reasonable care and professional competence [5] arose as a result of the circumstance that PMM knew that investors were relying upon its certification of the financial statements in Yale's annual report.

## A. COMMON LAW LIABILITY

Plaintiffs' claim is grounded in the common law action of deceit, albeit an unusual type in that most cases of deceit involve an affirmative misrepresentation by the defendant.[6] Here, however, plaintiffs attack PMM's nondisclosure or silence.

It is Dean Prosser's view that, in contrast with the issues raised when an affirmative misrepresentation is involved, "a much more difficult problem arises as to whether mere silence, or a passive failure to disclose facts of which the defendant has knowledge, can serve as the foundation of a deceit action." Prosser, Torts 533 (2d ed. 1955). The law in this area is in a state of flux due to the inroads being made into the old doctrine of *caveat emptor*. Although the prevailing rule still seems to be that there is no liability for tacit nondisclosure, Dean Prosser adds the following important qualification: "to this general rule, if such it be, the courts have developed a number of exceptions, some of which are

---

4. Since Yale's securities were registered on the New York Stock Exchange, Yale was required to have its annual report certified by an "independent public accountant". Section 13(a) (2) of the Securities Exchange Act of 1934, 15 U.S.C. § 78m (a) (2).

5. Breach of this duty is alleged in paragraph 26.1 of the second consolidated amended complaint but, of course, is not in issue here.

6. The complaint allegations attacked on this motion which are based on common law principles are subject to the pendent jurisdiction of this court. Although the parties are silent on the point, I have assumed that under the circumstances suggested by the complaint as a whole, this court should look to New York law on the questions here presented. No New York cases particularly in point have been found; however, it seems fair to assume that the New York courts would look to and apply the principles of the authorities herein discussed.

as yet very ill-defined, and have no very definite boundaries." Id. at 534. One of these exceptions is that

> "one who has made a statement and subsequently acquires new information which makes it untrue or misleading, must disclose such information to any one whom he knows to be still acting on the basis of the original statement * * *." (Ibid.) [1]

Section 551 of the First Restatement of Torts, which is couched in the specific terms of "a business transaction", is in substantial agreement with Dean Prosser. The Restatement position in Section 551(1) is that

> "one who fails to disclose to another a thing which he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter which he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question."

Section 551(2) lists the instances when the requisite duty to disclose arises. For present purposes, the following portion from that subsection is important:

> "One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated * * * (b) any subsequently acquired information which he recognizes as making untrue or misleading a previous representation which when made was true or believed to be so."

Although an exhaustive discussion of the cases supporting Dean Prosser and the Restatement is not necessary, an analysis of several typical authorities will illustrate the practical effects of the operation of the principles described above.

In Loewer v. Harris, 57 F. 368 (2d Cir. 1893), plaintiff buyer and defendant seller were negotiating the possible transfer of a brewery. In early January, 1891, the buyer made inquiries about the brewery's output and average profits, stressing the importance of the answers to his decision whether or not to purchase. The seller commented favorably on the operations inquired about. Later, on April 28, 1891, a purchase contract was executed.

During the period between the time of the representations and the time of the signing of the contract, the output and profits of the brewery declined. The seller never communicated these downturns to the buyer. When the buyer subsequently discovered the declines, he brought suit against the seller for failure to disclose them. The court held that nondisclosure under these circumstances was a proper basis for liability on the rationale that

> "when one of the parties, pending negotiations for a contract, has held out to the other the existence of a certain state of facts, material to the subject of the contract, and knows that the other is acting upon the inducement of their existence, and, while they are pending, knows that a change has occurred, of which the other party is ignorant, good faith and common honesty require him to correct the misapprehension which he has created. It becomes his duty to make disclosure of the changed state of facts, because he has put the other party off his guard." (57 F. at 373)

It should be noted that, in Loewer, the information contained in one representation was made untrue as a result of a change in the performance of the brewery; while, in the instant case, the representation was rendered false not by a change in conditions but by a discovery that the information on which the representation was based was itself false and misleading. This distinction would not seem crucial, however, for the impact upon the person who relies on the representation is the same: he is induced to act in reliance upon a representation which the representer knows has become false. In short, the manner in which the representation is transformed into a misrepresentation should not determine the

right of a plaintiff to maintain an action for nondisclosure.

In Fitzgerald v. McFadden, 88 F.2d 639 (2d Cir. 1937), one defendant, an attorney acting as an agent for his client, represented to the plaintiff that an invention of the client was patentable. The attorney subsequently learned that another person had filed for a patent involving a similar process but failed to convey this discovery to the plaintiff. An action was brought for damages suffered as a result of payments made by plaintiff to finance enterprises utilizing the allegedly patentable invention. Plaintiff's recovery against the defendant attorney was upheld by the Second Circuit on the ground that defendant allowed plaintiff to act on the basis of a statement made by the defendant which the latter knew had become false. Implicit in such a holding, of course, is the principle that the defendant was under a duty to notify plaintiff that he had learned that the invention involved might not be patentable.[7]

■ Generally speaking, I can see no reason why this duty to disclose should not be imposed upon an accounting firm which makes a representation it knows will be relied upon by investors. To be sure, certification of a financial statement does not create a formal business relationship between the accountant who certifies and the individual who relies upon the certificate for investment purposes. The act of certification, however, is similar in its effect to a representation made in a business transaction: both supply information which is naturally and justifiably relied upon by individuals for decisional purposes. Viewed in this context of the impact of nondisclosure on the injured party, it is difficult to conceive that a distinction between accountants and parties to a business transaction is warranted. The elements of "good faith and common honesty" which govern the businessman presumably should also apply to the statutory "independent public accountant".

PMM, of course, disputes the imposition of a duty to disclose and, for its purposes, properly emphasizes that the Restatement speaks in terms of "a business transaction" to which the alleged tortfeasor is a party and in which he has a definite pecuniary interest. Indeed, the cases discussed and cited heretofore involve instances where both plaintiff and defendant are economically affected by the defendant's nondisclosure.

PMM contends that the duty imposed on a party to a business transaction to disclose that a prior representation is false and misleading is "in no way pertinent to the standard of responsibility applicable to the independent auditor" (PMM's Reply Brief, p. 8) and that the obligation to disclose is contingent upon the presence of the opportunity for the accrual of personal gain to the nondisclosure party as a result of the nondisclosure.

The parties and the SEC have not supplied, nor has the court found, any cases which analyze the issue raised by this contention within a factual framework

7. Other cases which further illustrate the principles developed in the foregoing discussion are as follows: Strand v. Librascope, 197 F.Supp. 743 (E.D.Mich.1961) (defendant discovered falsity of representation made to explain error in manufacturing process of electronic equipment sold to plaintiff but did not disclose finding; Rest. Torts § 551(2) (b) cited and relied upon); Hush v. Reaugh, 23 F. Supp. 646 (E.D.Ill.1938) (defendant, a purchaser of an equity of redemption from plaintiff, represented during negotiations that value of land in question had not changed; subsequently, but before purchase, oil was discovered on land, but this fact was not disclosed to plaintiff); Schroeder v. Schroeder, 269 App. Div. 405, 56 N.Y.S.2d 36 (4th Dept. 1945) (defendant's agent represented to plaintiff that insurance policies to be assigned as part of separation agreement included dividends; subsequently, but prior to execution of agreement, defendant withdrew dividends but plaintiff was not told); Stevens v. Marco, 147 Cal.App. 2d 357, 305 P.2d 669 (1956) (defendant repudiated contract on ground that plaintiff's invention was not patentable; before release and accord, defendant found out invention was patentable but failed to disclose discovery to plaintiff).

involving nondisclosure of information which makes a prior representation false. As the ensuing discussion will show, however, this does not mean that plaintiffs' cause of action for deceit must be dismissed at this stage of this litigation, nor does it preclude a rational analysis of the issue raised by defendant.

[5] In cases involving affirmative misrepresentations, it is now the settled rule that a misrepresenter can be held liable, regardless of his interest in the transaction.

Such a rule took considerable time to develop. Apparently, in the early days of the common law, the action of deceit was limited almost entirely to cases involving direct transactions between the parties, and it came to be regarded as inseparable from some contractual relation. Prosser, Torts 522 (2d ed. 1955). Then, in 1789, in Pasley v. Freeman, 3 Term Rep. 51, it was held that an action for deceit would lie where the plaintiff had had no dealings with the defendant but had been induced by the latter's misrepresentation to deal with a third person.

American courts have consistently followed and elaborated upon this holding. A typical case is Endsley v. Johns, 120 Ill. 469, 12 N.E. 247 (1887). Briefly, the facts in *Endsley* were as follows: defendant had a partner who wished to buy some cattle from plaintiff. Defendant knew that his partner had no money in the bank; nevertheless, defendant took a check signed by his partner to plaintiff's home to complete the sale. When plaintiff was tendered the check as payment, he asked defendant whether the drawer had any money in bank, and defendant replied that he did. When the check was not honored because of insufficient funds, plaintiff brought suit for the resulting damages. There was no collusion between defendant and his partner, and defendant did not profit from the transaction.

The Illinois Supreme Court held, *inter alia*, as follows:

"The right of one damaged by the false representations of another, made with intent to deceive, and known to be false, to have his action on the case for deceit, notwithstanding the offender was not benefited by the deceit, and did not collude with the person benefited, must be regarded as established. The leading case upon this subject is Pasley v. Freeman, 3 Term R. 51." (12 N.E. at 250)

See also Holloway v. Forsyth, 226 Mass. 358, 115 N.E. 483 (1917).

This principle has been recognized by the United States Supreme Court. In James-Dickinson Farm Mortgage Co. v. Harry, 273 U.S. 119, 47 S.Ct. 308, 71 L.Ed. 569 (1927), an action for fraud was brought under the common law and a Texas statute. While there is some indication that an individual defendant, one Dickinson, did benefit from the fraudulent transaction, the court, in discussing Dickinson's liability, stated that "if Dickinson, either personally or through agents, made knowingly false statements with intent that the plaintiff should act upon them, his liability, either at common law or under the statute would not depend upon the receipt of any benefit by him." 273 U.S. at 123, 47 S.Ct. at 310.

Lower federal courts have also espoused the Pasley v. Freeman rule. E. g., Automobile Ins. Co. of Hartford v. Barnes-Manley Wet Wash Laundry Co., 168 F.2d 381, 385 (10th Cir. 1948); Anglo California Nat'l Bank of San Francisco v. Lazard, 106 F.2d 693, 703 (9th Cir. 1939); Blakeslee v. Wallace, 45 F.2d 347, 352 (6th Cir. 1930).

The rule of Pasley v. Freeman has also been applied when nondisclosure of information is involved. In Goldsmith v. Koopman, 140 F. 616 (S.D.N.Y.1905), an action to set aside the transfer of certain business interests because of the several defendants' fraudulent activities, defendant Koopman maintained that no action could be maintained against him on the ground that he had been silent during the misrepresentations complained of.

The court found that Koopman's silence was actionable. The duty to disclose was based on the fact that defend-

ant was in "the closest confidential relationship with the complainants." 140 F. at 621. The court refused to accept Koopman's

"final excuse * * * that, although it is true that complainants were fleeced most scientifically of their property, he cannot be held accountable because the books show that he gained nothing by the transaction, and there is no proof they are incorrect. I cannot consent to the inference that Koopman made nothing out of this adroit scheme of spoliation, in connection with which his active participation was an essential feature. Admitting that to be so, however, he cannot escape under the authorities as I read them. The complainants have been damaged to their hurt, and the defendant Koopman was a factor therein. That is the gravamen of the charge; not that defendant Koopman has gained, but that complainants have lost by his fault." (140 F. at 621)

■ In my view, accepting the pertinent allegations of the complaint to be true, PMM must be regarded as bound at this preliminary stage of the litigation by this rule of law. Though concededly "disinterested" in the sense that it achieved no advantage by its silence, PMM is charged in the complaint for losses realized by plaintiffs as a result of its nondisclosure. This is sufficient, at least in the pleading sense, under the cases discussed, save for one remaining problem—whether or not plaintiffs must plead and ultimately prove intent by PMM to deceive by its silence.

In Endsley v. Johns, supra, and James-Dickinson Farm Mortgage Co. v. Harry, supra, the court in each case, it is true, suggested that one of the elements necessary to support the cause of action was an intention by defendant to deceive plaintiff. In the present case involving nondisclosure of information which makes false a prior representation on which plaintiffs claimed to have justifiably relied, it can be argued that, absent proper allegations of intent to deceive, PMM is entitled to dismissal.

■ Careful reflection upon the ramifications of the basic rules of deceit liability constrain me to reject this argument, pending full resolution of the facts of this case.

■ Liability in a case of nondisclosure is based upon the breach of a duty imposed by the demands of "good faith and common honesty". Loewer v. Harris, 57 F. at 373. The imposition of the duty creates an objective standard against which to measure a defendant's actions and leaves no room for an analysis of the subjective considerations inherent in the area of intent. Thus, to base liability in part upon subjective standards of intent of the nondisclosing defendant would blur and weaken the objective basis of impact of nondisclosure upon the plaintiff. In the alternative, if this rationale be deemed unacceptable, it can be persuasively urged that in a nondisclosure case, intent can be sensibly imputed to a defendant who, knowing that plaintiff will rely upon his original representations, sits by silently when they turn out to be false.

■ In light of the foregoing discussion, I find no sound reasons to justify barring plaintiffs from the opportunity to prove a common-law action of deceit against PMM. It is true that each case cited and discussed above is factually distinguishable from the case at bar. But the distinctions create no presently discernible, substantial differences of law or policy. The common law has long required that a person who has made a representation must correct that representation if it becomes false and if he knows people are relying on it. This duty to disclose is imposed regardless of the interest of defendant in the representation and subsequent nondisclosure. Plaintiffs have sufficiently alleged the elements of nondisclosure on the part of this "disinterested" defendant. Accordingly, they must be given an opportunity to prove those allegations.

To conclude thus is not to ignore the manifold difficulties that a final determination of liability on the part of public accountants for nondisclosure would cre-

ate for professional firms and other business entities (and, indeed, individuals) similarly situated. Some obvious questions can be briefly set forth as examples of such potential problems. How long, for instance, does the duty to disclose after-acquired information last? To whom and how should disclosure be made? Does liability exist if the after-acquired knowledge is obtained from a source other than the original supplier of information? Is there a duty to disclose if an associate or employee of the accounting firm discovers that the financial statements are false but fails to report it to the firm members?

These and similar questions briefly indicate the potentially significant impact upon accountants, lawyers and business entities in the event that a precise rule or rules of liability for nondisclosure are fashioned and recognized in the law. On the other side of the coin, however, as the bulk of the discussion hereinbefore has shown, investors in publicly-held companies have a strong interest in being afforded some degree of protection by and from those professional and business persons whose representations are relied upon for decisional purposes. In my view, resolution of the issues posed by the complaint allegations here in question must be made with these important but conflicting interests in mind. Proper reconciliation of these interests or policy considerations, however, can only be made after full development of the facts of this case during the discovery process and at trial.

### B. SECTION 18 LIABILITY

Section 18(a) of the Securities Exchange Act of 1934 [8] specifically imposes civil liability upon

"any person who shall make or cause to be made any statement in any * * report * * * filed pursuant to this title or any rule or regulation thereunder * * *, which statement was at the time and in the light of the circumstances under which it was made false or misleading with respect to any material fact * * *."

It is uncontroverted that, on June 29, 1964, Yale filed with the SEC a 10–K Report, which contained, *inter alia*, PMM's certificate of the corporation's financial statements. Plaintiffs contend that PMM knew before the date of filing that the financial statements were false and submit that by allowing the statements to be filed, defendant "in effect caused a false certificate to be filed with the SEC. Liability would necessarily follow under § 18." (Plaintiffs' Memorandum, p. 21).

▮ Denying liability generally under Section 18, PMM specifically denies the allegation that it had discovered the falsity of the figures prior to or at the time of filing. It it thus obvious that a serious factual dispute is present here.[9] In light of this, I deem it advisable to defer resolution of the issue of PMM's Section 18 liability until the facts are more fully developed.

Accordingly, that portion of the motion to dismiss addressed to Section 18 of the 1934 Act is denied without prejudice to renewal at trial.

### C. SECTION 10(b) AND RULE 10b–5 LIABILITY

Plaintiffs additionally argue that the disputed allegations against PMM can be maintained under Section 10(b) of the Securities Exchange Act [10] and SEC Rule

---

8. 15 U.S.C. § 78r.

9. Robert G. Conroy, a partner of PMM, has submitted an affidavit in which, after discussing PMM's total lack of connection with the filing of the 10–K Report, he states, "In any event, PMM did not discover discrepancies in the 1963 financial statements on which PMM had rendered an opinion until well after the June 29, 1964 filing date." Plaintiffs contend

PMM's "discovery of management's alleged deception [was] well in advance" of the filing of the 10–K Report (Plaintiffs' Memorandum, p. 19).

10. 15 U.S.C. § 78j(b). The subsection provides as follows:
"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any fa-

10b–5 [11], promulgated thereunder.[12] PMM contends to the contrary and moves to dismiss any part of paragraphs 25–25.3 of the operative complaint which is grounded upon Section 10(b) and Rule 10b–5. Resolution of the issue created by these conflicting contentions is complicated by a comparison of the status of PMM with that of other defendants in reported cases dealing with civil liability under Section 10(b) and Rule 10b–5.

 It is now axiomatic that a private remedy exists for defrauded investors under Section 10(b) and Rule 10b–5. See 3 Loss, Securities Regulation 1763 (1961 ed.) Moreover, the statute and rule both state that they may be invoked against "any person" who indulges in fraudulent practices in connection with the purchase or sale of securities. In actual practice, however, defendants in Section 10(b) and Rule 10b–5 cases have tended to fall into four general categories. The first three are (1) insiders, (2) broker-dealers, and (3) corporations whose stock is purchased or sold by plaintiffs. Common to each of these categories is the possibility that economic gain or advantage will result from the fraudulent practices alleged in the complaint. The fourth category is composed of those who "aid and abet" or conspire with a party who falls into one of the first three.

In the complaint allegations addressed to the issuance of the allegedly false and misleading annual report, PMM seemingly does not fit into any of the four groupings.[13] The central issue, then, is whether a Section 10(b) action can be maintained against a defendant such as PMM which, so far as appears from the pleadings, did not directly gain from its failure to disclose its discovery of the falsity of the financial statements.

There has been some indication that the factor of gain is an important, if not dispositive, consideration. In Cochran v. Channing Corporation, 211 F.Supp. 239 (S.D.N.Y.1962), a Section 10(b) civil action was brought against certain directors and a controlling shareholder of a corporation, all of whom were considered "insiders" (211 F.Supp. at 242). One of plaintiff's causes of action was based upon defendants' failure to disclose to the public why the dividends of the corporation had been cut. Judge Dawson ostensibly took the position that nondisclosure alone would not have been sufficient to support the Rule 10b–5 action but had to be accompanied by defendant's use of the

cility of any national securities exchange—

 * * * * *

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

11. 17 C.F.R. § 240.10b–5 (hereinafter Rule 10b–5). The rule provides as follows:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a ma-

terial fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security."

12. Plaintiffs do not specifically discuss this contention in those portions of their memorandum which relate to this part of the motion. Defendants disclaim Section 10(b) liability at pp. 5–8 of their main memorandum; the SEC contends that a Section 10(b) action can be maintained at pp. 7–8 of its brief.

13. PMM is alleged to be an aider and abettor for its activity (or inactivity) relating to Yale's issuance of fraudulent interim statements. See discussion infra.

information not disclosed. Specifically, it was stated as follows:

> "The Securities Exchange Act was enacted in part to afford protection to the ordinary purchaser or seller of securities. Fraud may be accomplished by false statements, a failure to correct a misleading impression left by statements already made or, as in the instant case, by not stating anything at all when there is a duty to come forward and speak. It is the use of the inside information that gives rise to a violation of Rule 10b–5." (211 F.Supp. at 243)

While this statement has been characterized as dictum,[14] it is derived from a statement made by the SEC in Cady, Roberts & Co., 40 S.E.C. 907 (1961). In that opinion, the Commission found that insiders' obligation to disclose material information rested on two grounds:

> " \* \* \* first, the existence of a relationship giving access, directly or indirectly, to information intended to be available only for a corporate purpose and second, the inherent unfairness involved where a party takes advantage of such information knowing that it is unavailable to those with whom he is dealing." (40 S.E.C. at 912)

The rationale of *Cady, Roberts* and Cochran v. Channing Corp. has recently been followed by this court in an important case involving insiders' duty to disclose. Securities and Exchange Comm'n v. Texas Gulf Sulphur Co., 258 F.Supp. 262, 278–281 (S.D.N.Y. Aug. 19, 1966), appeal argued, No. 296, 2d Cir. March 20, 1967.[14a]

All three cases are, of course, distinguishable on their facts from the situation presented by the complaint here. First, none of the three involved nondisclosure in a report required to be filed with the SEC.[15] Second, none dealt with the unique type of nondisclosure alleged on PMM's part. Third, no attempt has been made to characterize PMM as an "insider" and to describe the consequences which might flow therefrom.[16]

Also potentially significant here, because the cases most resembling the facts pleaded by the present plaintiffs have been grounded upon an "aiding and abetting" theory, is the absence of specific assertions that PMM, by its failure to disclose its discovery of the falsity of the financial statements, aided and abetted Yale in defrauding plaintiffs.

In H. L. Green Co. v. Childree, 185 F. Supp. 95 (S.D.N.Y.1960), defendants were certified public accountants who, according to the complaint, knowingly prepared false financial statements and made other misrepresentations with intent to induce plaintiff to enter into a merger.

In denying defendants' motion to dismiss the Rule 10b–5 action, the court said, *inter alia:*

> "The complaint alleges that these defendants knowingly did acts pursuant to a conspiracy to defraud. Their status as accountants and the fact that their activities were confined to the preparation of false and misleading financial statements and representations does not immunize these defendants from civil suit for their alleged participation. The extent and culpability of that participation must be determined on the trial." (185 F.Supp. at 96)

There is no indication of what approach the court would have taken if the accountants had not been alleged members of a conspiracy to defraud.

In Pettit v. American Stock Exchange, 217 F.Supp. 21 (S.D.N.Y.1963), plaintiffs pleaded the existence of a conspir-

---

14. Fleischer, "Federal Corporation Law": An Assessment, 28 Harv.L.Rev. 1146, 1157 n. 51 (1965).

14a. Accord: Kohler v. Kohler Co., 319 F. 2d 634 (7th Cir. 1963).

15. The possible significance of this is touched upon in Fleischer, supra note 14, at 1156.

16. See generally Securities & Exchange Comm'n v. Texas Gulf Sulphur, 258 F. Supp. 262, 278–279 (S.D.N.Y. Aug. 19, 1966).

acy among all defendants, specifically asserting that the "defendant Exchange and its officers aided, abetted, and assisted the illegal distribution of Swan-Finch stock by failing to take necessary disciplinary action against abusive conduct and practices of which they knew or should have known." 217 F.Supp. at 28. A motion, made by the exchange and other defendants, to dismiss that part of the claim which was based on Section 10(b) was denied on the ground that, "since knowing assistance of or participation in a fraudulent scheme under Section 10 (b) gives rise to liability equal to that of the perpetrators themselves, the facts alleged by the trustees, if proven, would permit recovery under Section 10(b)." 217 F.Supp. at 28 (footnote omitted).

As in H. L. Green Co. v. Childree, supra, there was no discussion in *Pettit* of whether a Rule 10b–5 action could have been maintained absent an allegation of conspiracy or aiding and abetting. Such silence, while completely understandable in view of the allegations there set forth, is unfortunate since *Pettit* and the case at bar are analogous in at least two significant respects. First, neither the exchange nor the accounting firm had any economic interest in the transaction involved. Second, both defendants remained inactive in a claimed breach of a duty to disclose at a time when they knew[17] their inaction was having a detrimental effect on those to whom they owed the duty. It is perhaps arguable that because the defendant exchange in *Pettit* never made any representations upon which an investor could rely, there is theoretically a stronger case against PMM here, even absent allegations of aiding and abetting, in view of the latter's representations in the 1963 annual report.

Another case gives pause for reflection. In Miller v. Bargain City, U. S. A., Inc., 229 F.Supp. 33 (E.D.Pa.1964), defendants were (1) a corporation whose securities plaintiffs had purchased, (2) certain "insiders" of that corporation,

(3) an investment house (Bear, Stearns & Co.) and (4) an accounting firm (Laventhol, Krekstein & Co.). Plaintiffs based their claim on alleged violations of Section 10(b) and Rule 10b–5 (Count I) and of the common law (Count II).

The facts alleged were briefly as follows: defendant corporation filed reports and statements with the SEC which were "inaccurate, false, untrue, or misleading." These reports and statements were then reproduced in certain publications of Standard & Poor. Thereafter, relying upon the statements and reports, plaintiff Miller purchased Bargain City stock over-the-counter.

The complaint alleged that all the defendants were liable to the plaintiffs " 'by virtue of a conspiracy with respect to * * * violations' of Section 10(b) of the [Exchange] Act and Rule 10b–5." 229 F.Supp. at 36. A motion to dismiss the Section 10(b) and Rule 10b–5 claim on the grounds that it should have been based exclusively upon Section 18 of the 1934 Act and that there was no "privity" between plaintiffs and defendants was denied.

The court's comments on privity are of some import to our present problem. Since plaintiffs' claim against PMM arose only as a result of the statutory requirement that Yale's annual report be certified by an "independent public accountant", the "semblance of privity" between the parties which was made a requirement to a Section 10(b) action by the court in Joseph v. Farnsworth Radio & Television Corp., 99 F.Supp. 701 (S.D. N.Y.1951), aff'd per curiam, 198 F.2d 883 (2d Cir. 1952) is apparently not present here. In *Bargain City, U.S.A.*, there also was no privity or "semblance of privity" since plaintiffs there bought the defendant corporation's stock over the counter, but the court flatly rejected defendant's contention that the action should fail because of lack of privity.

The rationale of the court is persuasive. Judge Lord looked at the statute

17. In *Pettit*, it was alleged that the exchange "knew or should have known" of the illegal distribution of the stock in question. 217 F.Supp. at 28.

and at common law principles, neither of which require privity. On the basis of this finding, he concluded:

"In my judgment, it would be an unwarranted constriction of the broad protection contemplated by the federal scheme of securities legislation to engraft upon that scheme a requirement that is neither a part of the statute nor nor a part of the governing common law tort principles." (229 F.Supp. at 37)

Concluding that this approach is sound, I would refuse to dismiss this Section 10(b) action for lack of privity as that term is usually understood in the law. This is not to say, however, that the specific "connection" or relationship between plaintiffs and PMM is not important here, for this point, as will be seen, is central to this discussion of defendant's liability under Section 10(b) and Rule 10b–5.

The structure of the complaint and the status of the defendants in Miller v. Bargain City, U. S. A., raise several additional considerations which are pertinent. First, can a Section 10(b) action be maintained by a plaintiff against a defendant accountant if there is no allegation of conspiracy? On the basis of the facts described above, this question arises in the same context as that presented in H. L. Green Co. v. Childree, supra. Second, the court in *Bargain City, U. S. A.*, did not refer at all to the fact, if such it was, that any of the defendants benefited by dint of their alleged malfeasance. Perhaps such a benefit can be assumed to accrue to a corporation when it inflates its financial performance through false or misleading financial statements; perhaps such an allegation of gain is not necessary when the complaint alleges the issuance of false and misleading financial statements; or perhaps there was an allegation of gain but the court did not think any reference to it was necessary to the discussion of the issues of the motion. I hasten to add that I place no weight on the lack of mention of an allegation of gain; rather, I refer to it only because of the interesting questions it raises.

One further facet of *Bargain City, U. S. A.* should be considered. As stated above, plaintiffs there complained of misrepresentations made in reports and statements filed with the SEC by Bargain City and subsequently reproduced in various Standard & Poor publications. Plaintiffs alleged that they purchased Bargain City's securities in reliance upon these reports and statements, which were required by Section 13 of the 1934 Act and by the rules and regulations of the SEC.

In order for an action to be brought under Rule 10b–5, defendant's activities must be "in connection with the purchase or sale of any security." In *Bargain City, U. S. A.*, in spite of an allegation suggesting a clear connection between the alleged misrepresentations and plaintiff's purchase of securities, the court refused to rule on the issue, stating that "it would be premature to attempt here to determine the nature or extent of the connection required by the Act or its sufficiency in this case, for * * * the facts are not crystallized." 229 F.Supp. at 38. While I am not completely convinced that this conservative approach is warranted here, it does suggest that caution should be exercised in deciding the issue, particularly in view of the inadvanced state of discovery in our case.

One other authority should be discussed in relation to the "connection" issue. In Heit v. Weitzen, CCH Fed.Sec. L.Rep. ¶ 91,701, at 95,577 (S.D.N.Y. June 9, 1966), defendants were the Belock Instrument Corp. and officers and directors thereof. Plaintiff charged that defendants had violated Rule 10b–5(b) by failing to state in Belock's annual report and in various quarterly statements that the corporation's assets were overstated as a result of certain overcharges to the government.

This court found that the alleged fraud was perpetrated against the government and was not "in connection with the purchase or sale of securities", in spite of plaintiffs' allegations that they pur-

chased stock in reliance upon the figures contained in the allegedly false financial statements. Accordingly, a motion to dismiss that part of the complaint based upon Rule 10b–5 was granted.

In the instant case involving a failure to disclose after-acquired information, it is difficult to solve the "connection" issue in terms of PMM's "purpose". PMM had a very specialized and well-defined task: to audit and to certify Yale's financial statements for the protection of investors. In this sense, all of PMM's energies were directed toward investors. Such was not the case in Heit v. Weitzen where the defrauding of the investors was considered by the court to be secondary to the defrauding of the government.

Neither the conservative approach adopted in Miller v. Bargain City, U. S. A., supra, nor the ruling as to purpose in Heit v. Weitzen are controlling here because of obvious and important factual distinctions. They do, however, point up some of the problems and difficulties inherent in this phase of the motion and are factors which lead me to adopt the approach outlined immediately below.

 From the foregoing discussion, it can readily be seen that that branch of PMM's motion to dismiss any claims based on Section 10(b) and Rule 10b–5 raises novel and difficult issues. Because of the importance of the questions involved and the need for further factual and legal development of them by the parties and the SEC, I deem it best to deny this branch of PMM's motion without prejudice to renewal at trial.

## II.

## INTERIM STATEMENT LIABILITY

During PMM's conduct of the "special studies" in 1964, Yale utilized its internal accounting procedures to compile figures which could be used to evaluate the company's 1964 performance on a continuing basis. These figures were then inserted in various interim statements and reports issued by Yale, which, Paragraph 22 of the Second Consolidated Amended Complaint alleges, "were widely circulated" and in which there were "gross overstatements" of the company's "earnings and revenues and forecasts thereof".

Plaintiffs claim [18] that PMM is liable for damages suffered as a result of their reliance upon these allegedly false and misleading statements and reports. The argument made by plaintiffs in their memorandum submitted for purposes of this motion can be summarized in the following manner: the dissemination of the interim statements and reports constituted a violation by Yale of Section 10(b) of the 1934 Act in that it was a "manipulative or deceptive device" undertaken "in connection with the purchase or sale" of a security registered on the New York Stock Exchange. PMM knew as a result of its special studies that the figures disseminated were false and misleading but did not disclose its discovery thereof to anyone; moreover, PMM "recommended" to Yale that the false reports be issued. Plaintiffs conclude that, in light of these facts, PMM must be held liable under Section 10(b) for "aiding and abetting" Yale's scheme to defraud its investors. Urging that the complaint fails to succinctly state facts spelling out an actionable conspiracy and contending, that in any event, it owed no duty to the investing public in respect to the special studies, PMM moves to dismiss this claim.[19]

Before undertaking any discussion of the issues raised by these contentions, it should be made clear that I am assuming for the purposes of this motion only that a Section 10(b) cause of action can be maintained against Yale; the merits

---

18. The SEC's brief does not discuss PMM's possible liability for its activity, or lack thereof, related to the interim statements.

19. No express claim of "aiding and abetting" can be found in plaintiffs' complaint. Such a claim is, however, made in plaintiffs' memorandum submitted in opposition to this motion.

of such a proposition must await a later determination.[20]

Essentially, plaintiffs claim that PMM aided and abetted Yale in two ways: first, by remaining silent when it was known that the interim reports were false and, second, by recommending or sanctioning the issuance of the reports. There is no allegation that PMM compiled, audited, or certified any of the interim statements, nor is there indication that any of the statements contained material which an investor could justifiably attribute or relate to PMM.

One additional remark should be made by way of introduction to this particular aspect of the defendant's motion to dismiss. There is nothing in the language or legislative history of Section 10(b) of the 1934 Act or in the provisions of Rule 10b–5 which is of significant assistance here. Consequently, I must attempt to reason to a conclusion by application of case law and general principles of tort law. See Brennan v. Midwestern United Life Insurance Co., 259 F.Supp. 673 (N.D.Ind. Sept. 23, 1966).

## A. PMM'S SILENCE AND INACTION

The issue posed here was stated succinctly by the court in Brennan v. Midwestern United Life Insurance Company, supra:

"Certainly, not everyone who has knowledge of improper activities in the field of securities transactions is required to report such activities. This court does not purport to find such a duty. Yet, duties are often found to arise in the face of special relationships, and there are circumstances under which a person or a corporation may give the requisite assistance or encouragement to a wrongdoer so as to constitute an aiding and abetting by merely failing to take action. * * The question raised by the motion at bar is whether the allegations in the complaint will permit evidence which

may establish such circumstances in the instant case." (259 F.Supp. at 681–683)

Discussion of two cases in which defendants have been subjected to possible liability as aiders and abettors under Section 10(b) for their silence and inaction is helpful to resolution of this issue.

In Pettit v. American Stock Exchange, 217 F.Supp. 21 (S.D.N.Y.1963), analyzed heretofore in the discussion relating to PMM's liability attendant to the 1963 annual report, defendant stock exchange and its officers were held accountable for their failure "to take necessary disciplinary action against abusive conduct and practices of which they knew or should have known." 217 F.Supp. at 28.

The case is, however, distinguishable from the one at bar. In *Pettit*, the exchange was under an independent duty, imposed by Section 6 of the Securities Exchange Act,[21] to adopt and enforce just and equitable principles of trade. Liability was premised, of course, on the breach of that duty.

No similar independent duty can be found here by application of either statutory or common law principles. Contrary to plaintiffs' suggestion, issuance by Yale of the interim statements created no "special relationship" between the investors and PMM. In respect to the interim statements, PMM was not a statutory "independent public accountant" as it was during the audit and certification of the annual report. PMM made no representations which appeared in the statements, nor did it compile the figures contained therein. In sum, unlike the situation in *Pettit*, there is absolutely no basis in law for imposing upon PMM a duty to disclose its knowledge of the falsity of the interim financial statements.

The discussion of the court in Brennan v. Midwestern United Life Insurance Co., supra, lends support to this conclusion.

**20.** For a discussion of the problems raised by this contention, see Fleischer, "Federal Corporation Law": An Assessment, 78 Harv.L.Rev. 1146, 1156–58 (1965).

**21.** 15 U.S.C. § 78f.

In that case, defendant was a corporation whose stock was sold by a broker. At the time of suit, the broker was bankrupt. In a class action, plaintiff purchasers of securities alleged that the defendant issuer aided and abetted the broker's violations of Section 10(b) and Rule 10b–5 by failing to disclose to either the SEC or the Indiana Securities Commission that it knew that the broker was making fraudulent representations in the course of the sales and was improperly using the proceeds from the sales.

Defendant moved to dismiss the action on the ground, *inter alia*, that the complaint failed to state a claim under the "aiding and abetting" theory. The motion was denied. The court reasoned that defendant Midwestern was an "insider" allegedly taking advantage of the broker's activities and, as such, was under a duty to disclose to the investors that the broker was acting improperly. By remaining silent, Judge Eschbach concluded, this duty was breached and the defendant was thereby subject to the "aider and abettor" claim.

As in *Pettit,* defendant's liability was premised upon the rationale that the failure to disclose constituted a breach of duty. But, as indicated, no such duty can be found in the context of those facts pleaded here. Absent such a duty, there is no basis for transforming silence into actionable aiding and abetting.

## B. PMM'S ACTS OF RECOMMENDING RELEASE OF THE STATEMENTS

Plaintiffs contend that, in addition to failing to disclose that the Yale interim financial statements were false and misleading, PMM actively aided and abetted Yale's alleged violation of Section 10(b) by recommending or sanctioning the release of statements containing figures compiled by Yale's own accountants rather than figures developed by PMM during the course of the special studies. The basis for this claim is said to be found in answers given to plaintiffs' interrogatories (1st Series) by certain individual defendants who are former officers and directors of Yale. Specifically, the following statements are relied upon:

"16. Shortly before August 17, 1964, Robert G. Conroy of Peat, Marwick met with defendant Gerald W. Eskow, defendant Fred H. Mackensen and H. Kenneth Sidel at the Bon Vivant restaurant in New York City. At this meeting Mr. Conroy advised Mr. Eskow that the figures shown in the revised Peat, Marwick special study six month report could not be used as the basis of Yale's financial reports for the first half of 1964 and recommended that the corporation release instead the figures prepared by Mr. Mackensen as the head of its internal accounting operation.

17. Mr. Conroy stated that he did not know whether or not Mr. Mackensen's figures were correct and said that the Peat, Marwick special study would not show this even when it was complete. Mr. Conroy also said that basing the six month report upon the Mackensen figures would have the advantage of being consistent with previous reports and that any inaccuracies in these figures would be picked up by Peat, Marwick in the course of its year-end audit at which time any necessary adjustments would be made.

\* \* \* \* \* \*

19. Shortly before November 5, 1964, said Robert G. Conroy [partner of Peat Marwick] met with defendants Gerald W. Eskow and Fred H. Mackensen and Harold Rosegarten and H. Kenneth Sidel at a luncheon club in the Wall Street area. At this meeting Mr. Conroy told Mr. Eskow that the Peat Marwick special study report for the first nine months of 1964 could not be used as a basis for Yale's financial reports for this period. Mr. Conroy recommended that these reports be made on the basis of the figures prepared by Mr. Mackensen, once again stating that while he did not know that these figures were accurate he could not say that they were inaccurate either and using them would be inconsistent with earlier reports."

The issue, of course, is whether or not PMM can be termed "aiders and abettors" as a matter of law if the interrogatory answers by certain defendants are established as a matter of fact. Conveniently, the Restatement of Torts provides the following standard by which PMM's putative liability can be measured:

"For harm resulting to a third person from the tortious conduct of another, a person is liable if he

\* \* \* \* \* \*

(b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself. \* \* \*" (Restatement, Torts § 876 (1939))

Assuming that PMM knew that Yale was breaching is duty to its investors by issuing false financial statements,[22] the question becomes whether or not PMM gave "substantial assistance or encouragement" to Yale's course of conduct. ·

From the facts pleaded in the complaint, even when buttressed by the aforementioned answers to interrogatories, it is difficult to characterize PMM's action as "assistance or encouragement" in the sense contemplated by the Restatement. Even if these labels fit the pleaded facts, doubt remains as to whether or not the quantitative term "substantial" could be added to them.

It is, however, inappropriate to make a determination of the "aiding and abetting" issue at this time. Discovery is presently in a relatively inadvanced stage. While plaintiffs can now show only minimal interaction between PMM and Yale in relation to the interim statements, they must be given an opportunity to further explore this facet of the Yale-PMM relationship. "The very fact that

this case arises in a newly developing area of law cautions that the court should refrain from abstract and premature legal determinations fashioned in an evidentiary vacuum." Brennan v. Midwestern United Life Ins. Co., 259 F.Supp. at 682.

The cross motion of PMM to dismiss paragraphs 25–25.3 is denied. It is so ordered.

---

**22.** Note the Eskows' statement that Mr. Conroy of PMM said that he did not know whether or not the Yale figures were correct. In an affidavit submitted to this court in support of this motion, Mr. Conroy states, *inter alia*,

"Indeed, PMM during 1964 informed Yale's management, from time to time, that the interim figures which Yale's management had released, or was in the process of releasing, were materially different from interim unaudited statements which PMM had compiled from the special studies material. The decision to release the company prepared figures was made solely by management."