**COLE et al. v. LOMA PLASTICS,
Inc. et al.**

Civ. A. No. 2239.

United States District Court
N. D. Texas, Fort Worth Division.
March 2, 1953.

Reynolds & Ridings, Oklahoma City, Okl., for plaintiff John M. Cole, trustee.

McDonald, Sanders, Nichols, Ludlum, Wynn & Ginsburg, Fort Worth, Tex., for defendant Loma Plastics, Inc.

Simon, Jones & Ratliff, Fort Worth, Tex., for defendant Crown Machine & Tool Co.

DOOLEY, District Judge.

An involuntary petition in bankruptcy was filed against the partnership of Federal Identification Company, and the partners thereof, Robert O. Burbridge and Velma Jean Burbridge, individually, in the United States District Court for the Western District of Oklahoma on August 25, 1949. They were adjudicated bankrupts on February 15, 1950. The plaintiff John M. Cole became the duly appointed and qualified trustee on March 16, 1950.

The bankrupts had become beset with financial difficulties trying ineffectively to produce and market first an automobile window cooler, next a spring assembly, and then just before bankruptcy they were in the preliminary stage of development work on a dispenser unit. Some negotiations begun in June 1949 between the partnership bankrupts and the defendant Loma Plastics, Inc. (Loma) resulted in a written contract, evidenced by the bankrupts' purchase order and supplementary letter as modified by Loma's acceptance letter, for the manufacture of some molds (also later certain plastic parts), the molds to be made by the defendant Crown Machine & Tool Company (Crown), at the contract price of $13,400, and the minds of the parties met in the final terms of the contract on or about August 18, 1949. The bankrupts' said letter contained a reservation of the right to cancel the contract.[1] The defendant's accept-ance of the purchase order confirmed the understanding that the contract was subject to the buyers' right of cancellation.[2] The contract required the bankrupts to place an advance deposit of $6,700 with the two defendants as security available for use in defraying the costs of filling said order, and pursuant thereto the bankrupts delivered to Loma a cashier's check for $6,000 and an ordinary check for $700 on August 23, 1949. Loma in turn passed said checks to Crown. The last named check was not paid when presented at the drawee bank. The deficiency was never covered by the bankrupts. Shortly after bankruptcy supervened, Crown, first deducting $2,028.80 as claimed damages, remitted $3,971.20, the balance of the actual $6,000 deposit, to Loma.

The bankrupts were all insolvent and indebted to a number of creditors at, before and after the time when the terms of the contract aforesaid were mutually settled as above stated. The defendant Loma, acting for itself and the other defendant, negotiated the said contract at arm's length and in good faith, and at the time did not know the buyers were insolvent, but did learn of the petition in bankruptcy by August 30, 1949. The defendants each incurred some expense for technical work and some incidental items designed to make ready for performance of the pending contract, but did not do any well identified and segregated preparatory work under the contract, between the said contract date and the date the petition in bankruptcy was filed, nor any actual processing at any time, and said defendants did not incur any loss on material for the job either before or after they knew of the bankruptcy. In fact the defendants jointly wrote a letter dated September 3, 1949 to the Automotive Household Products Company (a newly organized corporation managed by the bankrupt Robert O. Burbridge and seeking to take over the contract of the

1. "In event we find it necessary to abandon the project, we have a right to cancel the order and to pay for the work done as indicated by time records, etc., plus a reasonable profit."

2. "If you find it necessary to abandon the project, you have the right to cancel the order, to pay for work done and also steel ordered and on hand if not returnable, material ordered, which cannot be used, and all to be indicated by time records plus bills from various sources of the materials."

Federal Identification Company), reading in part as quoted below.[3] Neither the molds nor any of the parts specified in the contract were ever made by the defendants, and they still hold the $6,000 deposit money in question. The trustee brought this suit to recover that sum plus interest, on the alternative theories that such payment was a fraudulent transfer under the bankruptcy law, or that defendants are liable as for money had and received or that said amount is repayable under the cancellation terms of the contract. The plaintiff trustee and the defendants, respectively, have presented a motion for summary judgment.

The pertinent provisions of the Bankruptcy Act, 11 U.S.C.A. § 1 et seq., bearing on the fraudulent transfer contention are copied in the margin.[4] The statutory requirement of "fair consideration", derived from the Uniform Fraudulent Conveyance Act, has been infrequently construed in the context of the Bankruptcy Act. The meaning is to be read from the language against the background of the general policy and purpose of the bankruptcy law.

Of course the expeditious collection, liquidation and distribution of insolvents' estates is the object of ordinary bankruptcy administration. Obviously the necessity of fair consideration is meant to serve as a check against the improvident or culpable depletion of estates preceding bankruptcy. On that premise it becomes doubtful that the mere static obligation of the other party under an executory contract with the subsequent bankrupt could often if ever meet the test of fair consideration for money paid in advance by the bankrupt. The statutory language is consistent with that strict viewpoint. The definition in the law treats of only four types of "fair consideration" and it is definitive. The inquiry here is quickly narrowed to a single type. No antecedent debt of the partnership bankrupts was discharged in this transaction nor did said bankrupts give any security in obtaining a present advance nor did they give security on any antecedent debt and so clearly there was no fair consideration present unless it be that the said bankrupts received a fairly equivalent *transfer* of "property" from the

3. "Our attorneys, Simon, Wynn, Sanders & Jones, contacted your attorney, Mr. Priest, I believe his name is, and the gist of the conversation was that we were to receive a $702.00 check from you the following day, which was last Wednesday, as the balance of our deposit and accrued protest fees.

"This check did not arrive, and consequently, our attorneys advised us to hold up our work, pending receipt of same. This morning we received a letter from you, dated September 2nd, in which you requested an invoice for $700.00 so that you could pay same. We do not feel as though an invoice should be forthcoming at this time, as the work has not been completed or even begun on this job. All we need is a check from you for $702.00 to complete the 50% down payment as agreed upon as a deposit before we were to proceed with your work. You realize, too, that the molds will not be delivered before 12 weeks after receipt of this $702.00 deposit."

4. "Sec. 67, sub. d(1) (e). Consideration given for the property or obligation of a debtor is 'fair' (1) when, in good faith, in exchange and as a fair equivalent therefor, property is transferred or an antecedent debt is satisfied, or (2) when

such property or obligation is received in good faith to secure a present advance or antecedent debt in an amount not disproportionately small as compared with the value of the property or obligation obtained."

"Sec. 67, sub. d(2). Every transfer made and every obligation incurred by a debtor within one year prior to the filing of a petition initiating a proceeding under this Act by or against him is fraudulent (a) as to creditors existing at the time of such transfer or obligation, if made or incurred without fair consideration by a debtor who is or will be thereby rendered insolvent, without regard to his actual intent; * * *."

"Sec. 67, sub. d(4). Every transfer of partnership property and every partnership obligation incurred within one year prior to the filing of a petition initiating a proceeding under this Act by or against the partnership, when the partnership is insolvent or will be thereby rendered insolvent, is fraudulent as to partnership creditors existing at the time of such transfer or obligation, without regard to actual intent if made or incurred * * * (b) to a person not a partner without fair consideration to the partnership as distinguished from consideration to the individual partners."

defendants. It would stretch this language to the verge to say that the defendants' executory contractual obligation in question constituted a transfer of "property" to the present bankrupts.[5] In fact, whatever may be true occasionally of executory considerations, it is apparent that in this particular instance the bankrupts, almost on the eve of bankruptcy, paid out $6,000, against only an inchoate quid pro quo, leaving the estate in all practical reality that much poorer in wherewithal for liquidation, and such a purported "fair consideration" without any impact is an anomaly, much too light for the scales of the bankruptcy law. The term "fair consideration" in its proper sense is no slight standard and actually has a stricter connotation than good or valuable consideration.[6] The promissory undertaking of the defendants dealt with a special order, not one for any staple or readily marketable product, and any potential value in the contract depended on the continuance of a going dispenser business but that untested prospect was dissipated by the immediate bankruptcy. It would be visionary to suppose there is here any contract value which can be translated into bankruptcy dividends or that when the money in question was paid over a fair consideration was received by the bankrupts. Common sense teaches that there is no workable way to recoup this depletion unless in a recovery against the defendants. The transaction was a fraudulent transfer within the meaning of the law.

The next question is whether, though said transfer was fraudulent, the defendants are entitled to any measure of protection under the further provision of the law copied in the margin.[7] Since the defendants are absolved from any actual fraudulent intent in this transaction they come within the purview of the law.[8] The advance deposit made by the bankrupts became subject to a lien for the benefit of the defendants.[9] Indeed the last cited statute gives the defendants a security interest in such money to the extent permitted by the terms of the law. The defendant Loma claims certain termination costs and $915.50 thereof are sufficiently related to the essentials of projected performance that same come within the intent of the law. The same can be said as to $636.80 in like claim of the Crown defendant. About half of these outlays probably were made after the protracted negotiations culminated in the contract,[10] and all of same whether after or before the contract date were directed to necessary steps in putting the existing or expected contract in workable order and readiness for course of performance, and consequently as tested by the event same are sufficiently identified as a consideration element in the actual contract. Each of the defendants also claims a considerably larger sum in the name of lost profits, but that part of the claims does not partake of the consideration in the contract, and if provable at all would have to be prosecuted by filing

5. In re Abraham Steers Lumber Company, D.C., 110 F. 738.

6. Buhl v. McDowell, 51 S.D. 603, 216 N. W. 346; Davis v. Hudson Trust Co., 3 Cir., 28 F.2d 740; McCaslin v. Schouten, 294 Mich. 180, 292 N.W. 696; Hansen v. Cramer, 39 Cal.2d 321, 245 P.2d 1059; Bowery v. Vines, 178 Tenn. 98, 156 S. W.2d 395.

7. "Sec. 67, sub. d(6). A transfer made or an obligation incurred by a debtor adjudged a bankrupt under this Act, which is fraudulent under this subdivision against creditors of such debtor having claims provable under this Act, shall be null and void against the trustee, except as to a bona fide purchaser, lienor, or obligee for a present fair equivalent value: Provided, however, * * * That such purchaser, lienor, or obligee, who without actual fraudulent intent has given a con-

sideration less than fair, as defined in this subdivision, for such transfer, lien, or obligation, may retain the property, lien, or obligation as security for repayment."

8. In re Peoria Braumeister Company, 7 Cir., 138 F.2d 520.

9. Tucker v. Dr. P. Phillips Co., Inc., 5 Cir., 139 F.2d 601.

10. The deposit requirement of the contract was in the nature of a condition precedent to performance on the part of the defendants, but not to the inception of the contract, and the contract became effective when the terms thereof were mutually settled on or about August 18, 1949. Foster v. Hudson Valley Lumber Company, Inc., D.C., 37 F.Supp. 381; Cozby v. Edwards, Tex.Civ.App., 203 S. W.2d 569.

a claim as creditor in the bankruptcy case. Each of the defendants has the legal right to reimburse itself to the extent of its cost and outlays as settled above out of the said deposit money, but the balance of the deposit money chargeable to it must be paid over to the trustee.

■ Virtually the same conclusion is reached from a straight contractual standpoint. The contract in question authorized the bankrupts to declare a cancellation in the event and on the terms stated. The trustee in that respect is in the shoes of the bankrupts. The cancellation contingency certainly was fulfilled with the inception of bankruptcy. Sometimes stipulations granting one party the right to cancel a contract are so much at sheer will that mutuality is defeated but that point is not present here. It is elementary that a contract without any provision for interim cancellation at the option of either party may be cancelled by consent, although if partly or wholly executed by one party a further consideration may be required to support the agreed cancellation. The cancellation of this contract pursuant to its terms obviously was by the consent of the parties, as they agreed to those very terms in the contract. Unquestionably such a cancellation provision is a valid and binding stipulation in a contract.[11] The question is no different than it would have been if no cancellation provision had been in this contract at the outset but later the parties agreed upon those very cancellation terms by another contract.[12] The cancellation provision of the contract stipulated for a good and valid consideration, that is upon the exercise of such option the buyers were bound to make a certain payment to the sellers. In other words certain expenses and contingent losses of sellers were recoverable, or maybe that much "plus a reasonable profit", as found in footnote 1. Evidently the defendants in asserting a right to offset lost profits against the plaintiff's claim would construe the last quoted words to mean a recovery of all their anticipated profits likened to a full performance of the contract. That is not the natural and reasonable meaning of the language. The obvious intent in the cancellation terms was to define an agreed liability incidental to exercising the cancellation right in the contract. The prospective profits latent in performance of the contract would be the maximum measure of damages recoverable by the sellers had there been an outright breach of the contract by the buyers,[13] but the exercise of a stipulated right to terminate is no breach of a contract.[14] It would be quite incongruous to think that the buyers here carefully reserved the right to cancel the contract but only at the same full liability attending a wrongful breach of it. That interpretation would make much ado about nothing out of this contractual provision. The seller's restatement of the cancellation terms in its acceptance letter did not repeat any reference to profits but if despite that the item was retained perforce the buyers' previous letter then its natural and logical meaning is no more than an addition of some reasonable sum in relation to the other reimbursable items to be paid by the buyers. It follows that looking alone to the terminated contract, the defendants' compensation at most would be confined to the same expenses and outlays covered by the sums previously stated herein "plus reasonable profits", but any such profits, whether large or small, could not be chargeable against the deposit money in question consistently with the terms and policy of the last mentioned statute, quoted in footnote 7, and consequently such profits cannot be dealt with under the contract alone, but controlling effect must be given to the statute. Furthermore the element of lost profits claimed by Loma relates altogether to the projected fabrication of plastic parts, spoken of in the purchase order as "200,000 more or less as

11. Jones v. Dumas Development Co., Tex. Civ.App., 229 S.W.2d 936; Northwestern Oil & Gas Co. v. Branine, 71 Okl. 107, 175 P. 533, 3 A.L.R. 344.

12. Harrigan v. Wolff, Tex.Civ.App., 18 S. W.2d 679.

13. Solomon v. Waterbury Brass Goods Corp., 2 Cir., 6 F.2d 990; Southwest Dairy Products Co. v. Coffee & Moore, 5 Cir., 62 F.2d 174.

14. Over v. Byram Foundry Co., 37 Ind. App. 452, 77 N.E. 302; Emerson-Brantingham Co. v. Lyons, 102 Kan. 733, 172 P. 513.

desired" and as "Parts to be made of LX Luxtrex in colors and white in quantities as required by purchaser", and the loose indefiniteness of that language make it doubtful there was any binding contract covering the supply of such parts.[15]

The plaintiff's motion for summary judgment is granted, consequently the defendants' respective motions for summary judgment are overruled, and plaintiff's judgment shall be for the recovery of $3,055.70 against the defendant Loma and $1,392 against the defendant Crown, plus interest on each sum at 6 per cent from August 25, 1949, and all costs are taxed jointly and severally against the defendants.