Charles **SELIGSON**, as Trustee in Bankruptcy of Ira Haupt & Co., a Limited Partnership, Bankrupt, Plaintiff,

v.

**NEW YORK PRODUCE EXCHANGE**
et al., Defendants.

No. 66 Civ. 1016.

United States District Court,
S. D. New York.

March 28, 1975.

See also, D.C., 378 F.Supp. 1076.

**126**

Weil, Gotshal & Manges, New York City, for plaintiff.

Baer & Marks, New York City, for defendant N. Y. Produce Exchange Clearing Ass'n.

Holtzmann, Wise & Shepard, New York City, for defendants N. Y. Produce Exchange, Donald V. MacDonald, Sidney Fashena, I. Usiskin & Co., Carl R. Berg.

Olwine, Connelly, Chase, O'Donnell & Weyher, New York City, for defendant N. Y. Produce Exchange.

Schwartzberg & Kittrell, New York City, for defendant Harry B. Anderson.

Brown, Wood, Fuller, Caldwell & Ivey, New York City, for defendant Merrill Lynch, Pierce, Fenner & Smith, Inc.

Dewey, Ballantine, Bushby, Palmer & Wood, New York City, for defendants Bunge Corp. and Walter C. Klein.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for defendants Continental Grain Co. and Harold C. Vogel.

## OPINION

ROBERT L. CARTER, District Judge.

Defendants New York Produce Exchange ("Exchange") and New York Produce Exchange Clearing Association ("Association") renew their motions for summary judgment with respect to the third count of the amended complaint ("complaint").

Of the facts found to be undisputed on the original motion and set out in detail at 378 F.Supp. 1076, only those which are relevant to the third count of the complaint are summarized here. Plaintiff is the trustee in bankruptcy of Ira Haupt & Co. ("Haupt"), which was the principal commodities broker for Allied Crude Vegetable Oil Refining Corporation ("Allied") for purposes of Allied's cottonseed oil futures trading on the Exchange during the latter part of 1963.

The Exchange is a self-regulated contract market on which commodities futures are traded. A broker generally purchases futures through the Association, initially by paying to the Association a fixed percentage of the purchase price as "original margin." Thereafter, in the event of a price decline, the purchaser may be required by the Association to provide such additional "variation margin" as is necessary to protect the Association from the effects of such price decline.

A futures contract is "cleared" through the Association when the Association "accepts" it, thereby gaining the rights and assuming the obligations of both parties to the contract.

During the latter part of 1963, Haupt and other brokers acting on behalf of Allied acquired a substantial "long" position in cottonseed oil futures.[1] By November 14, 1963, Allied was the purchaser in approximately 90% of the futures contracts traded on the Exchange. On that day, the Board of Managers of the Exchange learned of the magnitude of Allied's holdings from the Commodity Exchange Authority, and at a meeting held that day, the Board appointed a Control Committee to determine the precise extent of Allied's position.

---

1. That is, Allied was the *purchaser* in a very substantial number of transactions.

From November 14–November 19, 1963, the market for cottonseed oil futures declined sharply. In its extraordinary long position, Allied was highly vulnerable to the price decline. During this period, the Association repeatedly called upon Haupt to furnish variation margin and Haupt in turn requested reimbursement from Allied. By November 19, 1963, Allied was unable to meet Haupt's margin calls, and that day it filed a petition under Chapter XI of the Bankruptcy Act.

Later in the day on November 19, representatives of Haupt informed a joint meeting of the Executive Committee of the Exchange and the Board of Directors of the Association that it would be unable to meet its margin obligations if the market continued to drop.

After consultation with members of the Board of Managers of the Exchange, the Executive Committee of the Exchange recommended to the Board of Managers that trading in cottonseed oil futures be suspended until further notice and that settlement prices be fixed. On November 20, the Exchange did not open, and the Board of Managers formally adopted the Executive Committee's recommendations of the previous day.

On or about November 22, 1963, Haupt discovered that warehouse receipts, which Allied had given it as collateral for Allied's indebtedness, were worthless. The receipts were forged, and the vegetable oils purportedly represented by the receipts were non-existent. On March 23, 1964, an involuntary petition in bankruptcy was filed against Haupt.

In the third count of the complaint, the plaintiff trustee, acting pursuant to § 70(e) of the Bankruptcy Act, 11 U.S. C. § 110(e), seeks to set aside Haupt's

payments of over $12 million in variation margin to the Association from November 14 to November 20. The trustee alleges that the payments were fraudulent transfers under §§ 273–275 of the New York Debtor and Creditor Law, Consol. Laws, c. 12. It is alleged that the variation margin was transferred without fair consideration at a time when Haupt was insolvent, and that both the Association and the Exchange were fraudulent transferees.

Section 273 of the New York Debtor and Creditor Law provides that any conveyance made "by a person who is or will be thereby rendered insolvent * * * without a fair consideration" is fraudulent.[2]

The definition of "fair consideration" is given in § 272 which provides that fair consideration is given for property "[w]hen in exchange for such property, * * * as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied * * *."

The definition of "insolvency" is given in § 271 which provides, in pertinent part:

"1. A person is insolvent when the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured."

In determining whether a defendant may be held liable under § 273, at least three issues must be resolved: (1) whether the transferor was "insolvent" within the meaning of § 271 at the time of the transfer or was rendered insolvent thereby; (2) whether the transferor received "fair consideration" for the transfer within the meaning of § 272; and (3) whether the defendant sought to

**2.** Section 273 provides in pertinent part:

"Every conveyance made * * * by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made * * * without a fair consideration."

On the original motion, the court rejected plaintiff's contention that liability might be based on § 275. 378 F.Supp. at 1108.

The parties have not adequately briefed the issue of the Association's possible liability under § 274. Thus the court does not consider that issue.

be held liable is indeed the transferee of the fraudulent transfer.

With respect to the *Association* alone, the court denied its original motion for summary judgment without prejudice to its renewal on the ground that the record was inadequate to permit a determination of any of these three issues. In its original opinion the court set forth the nature of these three issues in the specific context of this case as follows (378 F.Supp. at 1107–08):

First, the record was inadequate to permit proper consideration of whether Haupt was "insolvent" within § 271 at the time of the margin payments, from November 14–19, or whether it was rendered insolvent by those payments.[3]

Second, there remained the issue of whether "fair consideration," within the meaning of § 272, was given in exchange for Haupt's transfer of $12 million to the Association.

Third, the court was unable to consider properly whether under the principle of United States v. Cambridge Trust Co., 300 F.2d 76 (1st Cir. 1962), the court should find that the Association was *not* the transferee of the payments. Applying *Cambridge Trust*, the issue was whether the Association was a known agent which had received money paid to it by mistake and had innocently and in good faith paid the money over to its members, its principals. However, the record was insufficient to permit a determination of whether the Association acted as agent for its members in receiving the payments; whether it acted in good faith; or whether Haupt was "mistaken" in paying variation margin to the Association.

With respect to the *Exchange's* motion for summary judgment on the third count, the court's previous opinion first found that there was no dispute that the Exchange was neither the transferee nor the transferee's grantee of the variation margin. The court therefore concluded that "liability if it exists must be premised on the principle enunciated in Board of Trade [of City of Chicago] v. Wallace, [67 F.2d 402 (7th Cir.), cert. denied, 291 U.S. 680, 54 S.Ct. 529, 78 L. Ed. 1067 (1933)], that the act of a clearing house is, in certain circumstances, deemed to be the act of the contract market with which it is affiliated." 378 F.Supp. at 1108. However, the court was unable to consider properly whether the relationship between the Association and the Exchange was similar to the relationship in *Wallace*.

(1) *Haupt's Insolvency between November 14 and 19, 1963*

The following facts concerning Haupt's financial condition appear to be substantially undisputed. Between November 14 and 19, Haupt paid to the Association variation margin in the amount of over $12 million. Allied never reimbursed Haupt for these payments. The payments of commodity margin to the Association and the Chicago Board of Trade were the only significant changes in Haupt's financial condition from November 14–20. Haupt's accounts receivable from Allied for this and Allied's other indebtedness were secured by warehouse receipts. After the payments of variation margin, Allied's total indebtedness to Haupt was approximately $31.8 million. The warehouse receipts given to Haupt as collateral were spurious, and Haupt discovered that fact on or about November 22, 1963.

On November 25, 1963, Haupt had a deficit of approximately $25.25 million in its net worth account reflecting the application of a reserve of approximately $31.8 million for the indebtedness of Allied, then in bankruptcy.

With respect to Allied, it is undisputed that by its own admission, it had a

---

3. On the original motion, the court rejected defendant's contention that *Allied*, rather than Haupt, had made the margin payments. The court found that Haupt had borrowed nearly all of the $12 million from banks and paid it directly to the Association, and that after November 13, 1963, Haupt received no funds from Allied. 378 F.Supp. at 1107.

capital deficiency as of July 31, 1963, of $34 million. As noted above and in the court's previous opinion, Allied held an extraordinary long position in cottonseed futures prior to and during the period, November 14–19. During that period, there was a substantial decline in the price of such futures.

Plaintiff's sworn answers to interrogatories in the case of Seligson v. The Fidelity & Casualty Co. of New York, 8510/1965 (Sup.Ct. N.Y. County),[4] the accuracy of which is not disputed by the Association, indicate that a senior Haupt employee, Jack E. Stevens, received certain information bearing on Allied's financial condition and hence on the value of the Allied receivables. Specifically, Stevens was informed on November 15, 1963, that Allied was experiencing financial difficulties, and that Allied officers would meet the following day to attempt to work out these difficulties. On November 16, he was informed that the officers of Allied had met but that they had failed to arrive at any solution to Allied's problems. On November 18 and 19, Stevens was informed of the failure of Allied to meet outstanding margin calls of November 14, 15 and 18. Also on November 18 and 19, several Haupt employees reported to Stevens concerning the financial predicament of Allied, the deteriorating condition in the commodity market, and the status of the Allied account. (Answers to Interrogatories Nos. 3(b)(xv)–(xviii)).

In addition, Stevens was repeatedly warned from September, 1963, through November 19, 1963, by officials of the Exchange and the Association and by numerous other persons of the magnitude of Haupt's financial exposure and of the need for establishing the legitimacy of Allied's position. (Answers to Interrogatories Nos. 3(b)(vi–xiii)). Stevens was also aware of Allied's withdrawal from Haupt of excess variation margin generated by the rising market through November 14. (Answer to Interrogatory No. 3(b)(xix)). Stevens did not inform the partners of Haupt of the relevant facts or of the significance of the information. (Ibid.).

■ In opposing the Association's motion for summary judgment, the trustee first claims that there is a genuine issue as to the ultimate fact of Haupt's insolvency during the period, November 14–19. The trustee directs the court's attention to the finding by Judge Palmieri that as of November 20, 1963, Haupt was "hopelessly insolvent," primarily as a result of its transactions with Allied. In re Ira Haupt & Co., 234 F.Supp. 167, 169 (S.D.N.Y.1964), aff'd, 343 F.2d 726 (2d Cir. 1965). Judge Palmieri's determination was based on the definition of "insolvency" in § 1(19) of the Bankruptcy Act, 11 U.S.C. § 1(19).[5] The meaning of the term "insolvency" in § 271 of the New York Debtor and Creditor Law has been held to be "insolvency in the bankruptcy sense." United States v. 58th St. Plaza Theatre, Inc., 287 F. Supp. 475, 497 (S.D.N.Y.1968). It appears, therefore, that the definitions in § 271 and § 1(19) are substantially equivalent.

Plaintiff contends that the court may infer from Judge Palmieri's finding of insolvency as of November 20, that Haupt was also insolvent during the period, November 14–19. In In re Great Western Biscuit Co., 85 F.Supp. 314 (S.D.Cal.1949), it was held that the referee may "draw his own inferences from the wretched financial condition of the bankrupt at the time of adjudication and infer bankruptcy as of [a] prior date." 85 F.Supp. at 315. There must, how-

---

4. Attached as Exhibit A to the Affidavit of Michael L. Cook, Esq., sworn to September 19, 1974.

5. Section 1(19) provides in pertinent part: "(19) A person shall be deemed insolvent * * * whenever the aggregate of his property, exclusive of any property which he may have conveyed, transferred, concealed, removed, or permitted to be concealed or removed, with intent to defraud, hinder, or delay his creditors, shall not at a fair valuation be sufficient in amount to pay his debts * * *."

ever, be a showing that there was "continuity or no change of position" in the bankrupt's financial condition between the earlier and later dates. *Ibid; accord,* Hassan v. Middlesex County National Bank, 333 F.2d 838 (1st Cir.), cert. denied, 379 U.S. 932, 85 S.Ct. 332, 13 L.Ed.2d 344 (1964).

In the instant case, as noted, it is substantially undisputed that between November 14 and November 20, there was no significant change in Haupt's financial condition except the margin payments to the Association and the Chicago Board of Trade. These can be accounted for, and the amounts involved may be precisely calculated. I therefore hold that the trustee may rely, at least in part, on the finding that Haupt was insolvent as of November 20, to establish that it was also insolvent during the period, November 14–19, or that it was rendered insolvent by the payments of variation margin during that period. At a minimum, the trustee has raised a genuine issue of material fact as to whether Haupt was insolvent from November 14–19.

There is also a genuine issue of material fact as to the "present fair salable value," as of November 14–19, of the Allied receivables representing both Allied's indebtedness to Haupt prior to November 14, and its indebtedness as a result of Haupt's payments of variation margin from November 14 through November 19. The proper valuation of the receivables is crucial to a determination of Haupt's solvency or insolvency during the six-day period in question.

In support of its claim that Haupt was solvent, the Association contends that the Allied receivables should have been valued at their face value of approximately $31.8 million, and that Haupt therefore had a net worth of over $6 million throughout this period. The Association argues that Allied was a large, "going enterprise", and that as a result, "there [was] no basis for questioning [the] worth and sufficiency [of the receivables] as of the times when Haupt made margin payments to the Association." (Affidavit of George H. Colin, sworn to July 16, 1974, ¶5).

In addition, the Association cites an "accounting authority" for the proposition that Haupt's balance sheet showed its financial condition "at a particular moment of time." As of the "moment" under consideration, November 14–19, the receivables were properly carried at their face value of $31.8 million. According to the Association, the fact that on November 25, the receivables were written off as worthless has no bearing whatever on Haupt's solvency as of the period six to eleven days earlier.

With respect to the warehouse receipts held as collateral, the Association argues similarly that because Haupt had no reason to suspect that they were forgeries as of November 14–19, they should properly be valued at full value for that period. The fact that on November 22, 1963, Haupt discovered them to be forgeries is, according to the Association, irrelevant.

In reply, plaintiff argues that the crucial fact is the *actual* value of the Allied receivables as of November 14–19, *not* merely the *stated* value or the value erroneously attributed to them by Haupt during that period on the basis of misinformation supplied by Allied. In support of this position, plaintiff argues that the court may infer the value of the receivables as of November 14–19, from evidence of their value on November 25, 1963. [6]

In Hassan v. Middlesex County National Bank, *supra,* the trustee sought to establish that the bankrupt was insolvent as of October 23–25, 1961. The only evidence of the value of certain assets was a closing inventory taken some

6. The reference here is to the receivables and collateral corresponding both to Allied's indebtedness before November 14, and to its indebtedness which arose as a result of the payments of variation margin from November 14–19.

three months later, on January 23, 1962. The Court of Appeals for the First Circuit held that the value of the assets as of October 23–25, 1961, could be calculated by taking the January 23, 1962, figures and working backward through the entries in the ledger to reflect sales and purchases in the interim. The court emphasized, however, that the trustee must establish that there were no substantial changes in the assets of the corporation between the two dates. The court said:

"[The Trustee] was forced to resort to this round-about method due to the fact that no inventory of the corporation taken since June of 1960 had been * * * made available to him. Insolvency is not always susceptible of direct proof and frequently must be determined by the proof of other facts or factors from which the ultimate fact of insolvency on the transfer dates must be inferred or presumed. [citation omitted]. * * * [I]t is essential that the trustee be able to show the absence of any substantial or radical changes in the assets or liabilities of the bankrupt between the retrojection dates. [citation omitted]." 333 F.2d at 840–41.

"Retrojection" was also permitted by the Fifth Circuit in Haynes & Hubbard, Inc. v. Stewart, 387 F.2d 906, 907 n. 1 (5th Cir. 1967), where the trustee determined the value of certain mortgaged property as of a date prior to bankruptcy on the basis of its value subsequent to the filing of the petition.

In the present case, it is undisputed that on November 22 and 25, 1963, the Allied warehouse receipts and receivables respectively were worthless. Applying Hassan v. Middlesex County National Bank, *supra*, to this case, I hold that the trustee may rely wholly or in part on the worthlessness of the Allied warehouse receipts and receivables on November 22 and 25, 1963, to establish

their value as of November 14–19. The trustee has therefore raised a genuine issue of material fact as to the value of these assets during the period in question. [7]

The court will consider Allied's undoubted insolvency on November 19 and thereafter in determining its financial condition and hence the value of its obligations during the earlier period, November 14–19.

■ Moreover, in establishing that the Allied receivables were either worthless or worth a fraction of their face value, the trustee may also rely, at least in part, on the fact that Haupt has recovered nothing on its claim in bankruptcy against Allied. This fact is not, however, determinative. Irving Trust Co. v. Jacob Weckstein & Sons, Inc., 64 F.2d 333, 335 (2d Cir. 1933); Haynes & Hubbard, Inc. v. Stewart, *supra*, 387 F. 2d at 907 n. 1.

■ In disputing the Association's contention that as of November 14–19, the receivables should be valued at face value, the trustee relies not only on the value of the receivables *subsequent* to November 19, but on evidence of Allied's financial condition *prior to* and *during* the period in question.

In Irving Trust Co. v. Jacob Weckstein & Sons, Inc., *supra*, a voidable preference action, the court accepted an accountant's valuation of certain notes held by the bankrupt at 30% of their face value as of the date of transfer. The court held that the discount was justified, *inter alia*, because a receiver had been appointed for the account debtor one month before the valuation date; because conditions in the account debtor's industry were unfavorable; and because recoveries from insolvencies in the account debtor's business had rarely exceeded 30–40%. The court said:

"It is clearly proper to value the notes of [an account] debtor already in re-

---

7. Indeed, it seems to the court that there is little doubt that the warehouse receipts which were known to be worthless forgeries on November 22 were equally worthless on November 14, whether or not Haupt mistakenly attributed value to them.

ceivership at less than their face. [The accountant's] experience and general information concerning conditions in the [account debtor's industry around the time of the transfer] and concerning the general opinion of the trade as to [the account debtor] qualified him to form an opinion as to the fair value of [the] notes * * *." 64 F.2d at 335.

In valuing accounts receivable, other cases have laid emphasis on the degree of risk and uncertainty facing the account debtor on the valuation date. Daniels & Fisher Stores Co. v. Gregg, 9 F.2d 43 (8th Cir. 1925) (account debtor's ability to pay subject to uncertainties of agricultural prices); In re Georgia Jewelers, Inc., 219 F.Supp. 386, 395–98 (N.D.Ga.1962); 1 Collier on Bankruptcy ¶1.19[3] at 125–26 n. 20 (14th Rev.Ed. 1973).

As in *Irving Trust* and *Daniels & Fisher, supra,* the trustee in the present case has presented evidence of Allied's financial condition and of conditions in the market prior to and during the period, November 14–19. As in *Irving Trust* and *Daniels & Fisher, supra,* the evidence here indicates that the Allied receivables should be valued at substantially less than face value. First, as noted, Allied had a capital deficiency of $34 million as of July 31, 1963, and its petition under Chapter XI admitted insolvency as of that date. Second, throughout November, 1963, and during the five-day period, November 14–19, Haupt was in a precarious financial position because of its extraordinary, speculative long position. As in the case of the account debtor in *Daniels & Fisher, supra,* the ability of Allied to pay its obligations was dependent on a rise in prices. Such a rise was most unlikely because the prices were already inflated by Allied's massive speculative purchases and would probably decline sharply when Allied ceased to purchase. In any event, this evidence would seem sufficient in and of itself to raise a genuine issue of material fact as to the value of

Allied's receivables as of November 14–19.

As noted, the Association contends that it is significant that Haupt believed that the Allied receivables were entitled to full value and that the warehouse receipts were genuine. Haupt carried the receivables at full value on its books, and the Association contends that this was proper accounting practice since Haupt was not aware of any reason that the receivables should be discounted. Without accepting the Association's apparent contention that an insolvent company which is defrauded into believing that it is solvent should be deemed solvent, the court concludes that the trustee has raised a genuine issue as to Haupt's knowledge of Allied's true financial condition. As set forth above, there is evidence that Jack E. Stevens, a senior Haupt employee, was informed at least by November 15, 1963, of Allied's financial difficulties but that he failed to inform Haupt's partners. The nature and extent of the knowledge of Stevens and other Haupt employees of facts bearing on the value of the Allied receivables must be examined more fully at trial.

In summary, the plaintiff has raised several genuine issues of material fact bearing on the issue of whether Haupt was insolvent during the period, November 14–19.

### (2) *Fair Consideration*

The Association argues that it gave "fair consideration" for the transfers within the meaning of § 272 of the Debtor and Creditor Law, and that therefore it was not a fraudulent transferee even if Haupt was insolvent at the time of the transfers. In support of this claim, the Association enumerates several forms of consideration which it gave for Haupt's payments of variation margin.

It appears to be undisputed that the Association provided certain services and things of benefit to Haupt. *First,* the Association accepted, cleared and guaranteed contracts for Haupt upon

Haupt's commitment to pay such variation margin as might be required in the future under Association rules. *Second,* in exchange for payments of variation margin, the Association refrained from liquidating Haupt's account. Moreover, the variation margin payments were credited to Haupt, diminishing Haupt's potential liability in the event of liquidation of its account. *Third,* just as Haupt had an obligation to pay variation margin to the Association when it was in a net debit position, it had the *right* to *receive* payments of variation margin from the Association when it was in a net credit position.

Finally, the Association contends that when Haupt had cleared contracts prior to the six-day period in question, it had incurred an obligation to the Association; this antecedent debt was consideration for the subsequent payment by Haupt of over $12 million in variation margin.

In opposition, the trustee first contends that there is a genuine issue as to whether any of these forms of consideration was given in good faith and hence as to whether any of these considerations constituted "fair consideration" within the meaning of § 272.

In Cohen v. Sutherland, 257 F.2d 737, 742 (2d Cir. 1958), an action to set aside a fraudulent conveyance under both § 67(d)(2) of the Bankruptcy Act, 11 U.S.C. § 107(d)(2), and § 273 of the New York Debtor and Creditor Law, the Court of Appeals for this circuit held that to constitute "fair consideration" for purposes of § 67(d)(2), consideration must be given in good faith. The court stated that the requirements of "fair consideration" under § 272 are the same, 257 F.2d at 743; and, as noted, § 272, by its terms, requires that the consideration be given in good faith. *See* Bullard v. Aluminum Co. of America, 468 F.2d 11, 13 (5th Cir. 1972). In *Cohen, supra,* the Court of Appeals indicated that if the transferee had knowledge of the unfavorable financial condition of the transferor at the time of the transfer, it could not meet the good faith requirement. 257 F.2d at 742.

As noted, this court's previous opinion found that the Association was at least aware of Haupt's and Allied's precarious position in the market. The Association has made no showing of good faith. The court believes that the Association's awareness of Haupt's position in the market may support an inference that it was aware of Haupt's financial condition. The trustee has therefore raised a genuine issue of material fact as to the Association's good faith.

The Association contends that the issue of good faith was foreclosed by the court's finding in its original opinion that certain facts were "insufficient to give rise to an inference of bad faith regulation." 378 F.Supp. at 1100. That finding was, however, confined exclusively to the issue of good faith *regulation,* and has no application whatever to the question of whether the Association *gave consideration* in good faith.

The requirement of § 272 that the consideration be a "fair equivalent" for the property transferred suggests that in order to satisfy § 272, the consideration must be such that the bankrupt's estate is not depleted as a result of the transfer.

Assuming that the consideration provided by the Association would support a simple contract, there remains a substantial question whether such considerations as the promise of the Association to clear Haupt's contracts or its forebearance to liquidate Haupt's position in any way offset the depletion of the estate caused by the transfer of $12 million in margin.

In the same vein, the trustee contends that the value of certain of the consideration was dependent on Haupt's continued operation as a broker-dealer, and that in view of Haupt's collapse, such consideration was of no value in arresting the depletion of the estate. In Cole v. Loma Plastics, Inc., 112 F.Supp. 138 (N.D.Tex.1953), the transferee contended that its promise to deliver certain

mechanical parts to be used in a machine which the bankrupt had planned to manufacture constituted "fair consideration." The court held that the promise was not "fair consideration" because the bankrupt's ability to take advantage of such an executory consideration was extinguished by the bankrupt's collapse:

"The promissory undertaking of the defendants dealt with a special order, not one for any staple or readily marketable product, and any potential value in the contract depended on the continuance of a going dispenser business but that untested prospect was dissipated by the immediate bankruptcy." 112 F.Supp. at 141.

In the present case, the trustee contends that Haupt's right to receive excess variation margin in the event that it achieved a net credit position was of no benefit whatever to Haupt unless it continued in operation as a broker-dealer. And the court believes that in light of Haupt's collapse, it is most unlikely that Haupt's contingent right to receive such payments served in any way to preserve Haupt's estate.

As noted, it has been argued that prior to the payments of variation margin, Haupt was indebted to the Association and that this antecedent indebtedness was "fair consideration" for the payments. Section 272 of the Debtor and Creditor Law specifically provides that antecedent indebtedness may constitute "fair consideration." *See* McNellis v. Raymond, 287 F.Supp. 232 (N.D.N.Y. 1968), aff'd in part and rev'd in part, 420 F.2d 51 (2d Cir. 1970); Vinlis Construction Co. v. Roreck, 67 Misc.2d 942, 946, 325 N.Y.S.2d 457, 462 (Sup.Ct. 1971). As on the original motion, however, the Association has not cited any authority for the proposition that under Association rules, Haupt owed an antecedent obligation.

Moreover, even assuming that there was an antecedent debt, the Association has made no showing that it acted in good faith in giving the initial consideration which gave rise to that antecedent obligation. *See* 378 F.Supp. at 1108.

In summary, there remain several genuine issues of material fact with respect to the requirement of fair consideration, and the Association has not shown that as a matter of law it gave such fair consideration for Haupt's transfers of variation margin.

(3) *The Association as Transferee of the Margin Payments*

On this motion, the Association renews its contention that it may not properly be deemed the transferee of the margin payments. In support of its claim, it cites United States v. Cambridge Trust Co., *supra*, where it was held that a known agent who receives money paid to him by mistake is protected from liability if innocently and in good faith he has paid money over to his principal before receipt of a notice of the payor's mistake. 300 F.2d at 78.

There appears to be no substantial dispute as to the following facts concerning the Association's relationship to its members and the capacity in which it received Haupt's payments. The Association collects variation margin from members in a net debit position, and makes payments of excess variation margin to members in a net credit position. Each day, after the daily settlement, the total amount of the variation margin drafts paid by the Association to members in a net credit position is equal to the total amount of the variation margin checks received by it from members in a net debit position. During the period, November 14–19, the Association followed its usual practices with respect to the $12 million in variation margin which it received from Haupt which was then in a net debit position.

In United States v. Cambridge Trust Co., *supra*, an individual named Porter altered several postal money orders and endorsed them to a depositor in the defendant Bank. The depositor in turn delivered the money orders to the Bank

for deposit. The Bank then transmitted the money orders through its correspondent bank to the Federal Reserve Bank for collection. The defendant Bank received payment of the orders from the Federal Reserve Bank, and paid the entire proceeds to its depositor. It was undisputed that before formal notice, the Bank had no knowledge of the alterations, and that the Bank acted throughout subjectively in good faith. The Court of Appeals for the First Circuit found that by the terms of the money order, the Bank's *depositor*, rather than the Bank, was the owner of the order. The court therefore concluded that the Bank could legally be acting only as its depositor's agent for collection. 300 F.2d at 78. The court also found that the Federal Reserve Bank had knowledge of the agency relation, and that it had made the payment by mistake. The court's holding that the Bank was not liable to the Federal Reserve Bank rested on a "well established principle" of agency:

> " * * * [A] known agent who receives money paid to him by mistake is protected from liability if innocently and in good faith he has paid the money over to his principal before receipt of notice of the payor's mistake. [citations omitted]." *Ibid.*

This principle is stated in Restatement 2d, Agency § 339, Comment f (1958); *see* John L. Burns, Inc. v. Gulf Oil Corp., 268 F.Supp. 222, 224 (N.D.Ga. 1967).

In Goodbody & Co., Inc. v. Sultan, 346 F.Supp. 1375 (S.D.Fla.1972), as in *Cambridge Trust, supra,* the court exonerated the defendant only after a thorough examination of the facts which supported the finding of an agency. In *Goodbody,* the plaintiff brokerage house accepted custody of worthless stock owned by one "Eduardo" who had an account with the brokerage house. Eduardo was indebted to one "Sultan." Sultan also opened an account with the brokerage house, and the plaintiff brokerage house was aware of an arrangement between Eduardo and Sultan whereby Sultan might collect the proceeds, if any, of a sale of the stock and remit them to Eduardo, deducting the amount of Eduardo's obligation to Sultan. Shortly after Eduardo's stock was deposited with the plaintiff brokerage house, the plaintiff mistook that stock for other securities of great value, and purchased Eduardo's stock, paying a large sum of money to Sultan. Sultan remitted most of the proceeds to Eduardo, and deducted the amount of Eduardo's debt to him. The court found that the brokerage house knew that Eduardo was the owner of the stock, and therefore should have known that Sultan was merely his agent for purposes of selling the stock and collecting the proceeds. The court held that the brokerage house could not recover back from Sultan the excessive sum it had paid to him as an agent for a disclosed principal.

In the present case, the Association claims that it is protected from liability by the principle of *Cambridge Trust.* It contends that in receiving margin payments from Haupt and other debit members of the Association, it acted as a disclosed agent for its credit members. There are, however, a number of genuine issues of material fact with respect to the Association's claim that the requirements of *Cambridge Trust* have been met.

It is most doubtful that the Association has presented facts sufficient to support a finding of an agency relationship. *See* Restatement 2d, Agency § 1. The Association's sole contention in this regard is that it was a mere "conduit" for the transmittal of margins from debit to credit members. The use of this figure of speech is hardly a substitute for a showing of facts as to the precise nature of the relationship between the Association and its credit members.

In *Cambridge Trust, supra,* the defendant Bank, the "agent," established that the money orders evidencing the plaintiff Federal Reserve Bank's obliga-

tion were owned not by the defendant, but by the putative principal, the Bank's depositor. The defendant thereby showed that the obligation was owed not to itself, but to the depositor. This showing enabled the court to conclude that the defendant Bank was acting as an agent for the depositor, and not on its own account, in collecting the amount due on the obligation.[8]

In the instant case, the Association has presented no evidence whatever tending to show that Haupt's obligation to pay variation margins was owed directly to the credit members, the alleged principals, rather than to the Association, the alleged agent. Indeed, Association By-Law § 24(3) suggests the contrary.[9] It refers to "margin calls or any other obligation *to the Association*" (emphasis added), indicating that the obligation to pay variation margin is owed to the *Association, not* to the credit members. In fact, the By-Laws suggest that the Association collects variation margin on its own account, and that it remains the Association's property until the Association decides to pay its own obligations to net credit members. In any event, the trustee has, at a minimum, raised a genuine issue as to whether Haupt owed its obligation directly to the credit members, and this issue is material to the question of whether the Association acted as an agent for net credit members.

There has been no showing whatever of facts tending to establish that the other characteristics of an agency relationship were present. For example, the Association has not shown that in collecting margin payments it was subject to the control of net credit members or that it had consented to act in a fiduci-

ary capacity for the benefit of credit members. *See* Restatement 2d, Agency, § 1.

The Association has also failed to present evidence that Haupt made the margin payments by *mistake* and to explain to the court the meaning or significance of the "mistake" requirement of United States v. Cambridge Trust Co., *supra.*

Finally, as noted, the Association's undisputed awareness of Haupt's and Allied's market position raises a serious issue as to the Association's good faith in accepting the variation margin payments. That issue of material fact would have to be resolved in the Association's favor before it could properly be granted the protection of *Cambridge Trust* on summary judgment. It has not as yet been so resolved.

In summary, because there remain genuine issues of material fact as to Haupt's insolvency during the period in question; as to whether Haupt received "fair consideration;" and as to whether the Association is entitled to the protection of *Cambridge Trust*, the Association's motion for summary judgment as to the third count of the amended complaint is in all respects denied.

### *Liability of the Exchange*

The trustee seeks to hold the Exchange accountable for the action of the Association in receiving alleged fraudulent transfers of variation margin from Haupt on the principle of Board of Trade v. Wallace, *supra.* That case held that in certain circumstances, the acts of a clearing house may be attributed to the exchange with which it is affiliated.

---

8. Similarly, in Goodbody, *supra*, the court, in finding an agency, relied in part on the fact that the plaintiff brokerage house knew that *Eduardo*, not *Sultan*, owned the stock which plaintiff purchased. The court concluded that the plaintiff therefore should have known that *Sultan* was acting merely as an agent for *Eduardo* in accepting the proceeds of a sale of the stock.

9. The reference here to a By-Law section is taken from an unnumbered exhibit in the court's file containing the By-Laws, Rules and Regulations of the Association.

There has been no showing that if Haupt defaulted on a margin payment, a *net credit member* would have a direct right of action against Haupt. It appears that the right of action would belong *to the Association.*

In the previous opinion in this case, the court found that the Exchange was not the recipient of the variation margin transferred by Allied. On the present motion, there appears to be no dispute as to any material fact on the issues raised by *Wallace*, and the Exchange has shown that, as a matter of law, the principle of *Wallace* does not require that the Exchange be held liable in the instant case.

In Board of Trade v. Wallace, *supra*, where the Clearing Corporation had wrongfully refused membership in the Clearing Corporation to "Farmers National," the Seventh Circuit held that the act of the Clearing Corporation might be attributed to the Chicago Board of Trade, and that a federal agricultural commission might properly suspend the Board of Trade's designation as a contract market.[10]

The holding was based on the court's conclusion that the operations of the Clearing Corporation were "within the absolute power and control" of the Board of Trade. 67 F.2d at 406. In the instant case, by contrast, the undisputed facts show that the Exchange did not exercise such control over the Association, and I therefore conclude that the Association's acts should not be attributed to the Exchange.

In *Wallace*, the Board of Trade had "abandoned the practice of itself clearing trades by creating [the Clearing Corporation] to take over this function." *Ibid.*[11] The Clearing Corporation had "no function but to clear such trades as [were] made on the [Board of Trade]." *Id.* at 404. By contrast, in the present case, the Association was separately incorporated, and its charter suggests that its purposes are somewhat broader than the clearing of contracts on the Exchange.[12]

In *Wallace*, the Board of Trade exercised complete control over the selection of the Board of Governors of the Clearing Corporation. In the present case, there is no indication that the Exchange plays any part in the designation of the Association's Board of Directors. The membership of the Board of Managers of the Exchange is wholly different from that of the Board of Directors of the Association; there is no overlap. The Association has its own officers, its own managers, and its own books, bank accounts and investors.

In *Wallace*, a rule of the Board of Trade provided that *all* trades must be cleared through the Clearing Corporation. By contrast, in the instant case, the Board of Directors of the Association may, in its discretion deny to anyone the privilege of clearing contracts. (Association By-Law § 27)[13] Rules of the Exchange recognize that the Association may refuse or fail to accept a contract for clearance. (Cottonseed Oil Futures Rule 25). In such event, the contract is to remain binding on the parties, and the margin is to be deposited with the Secretary of the Exchange. (Cottonseed Oil Futures Rule 27).

In *Wallace*, the Clearing Corporation was prohibited from changing its by-laws without the consent of the Board of Trade. In the present case, the by-laws of the Association provide for amendment by a vote of two-thirds of the

---

10. The federal commission could not take direct action against the Clearing Corporation because it was beyond the jurisdiction of the commission.

11. The Board of Trade created the Clearing Corporation solely for the purpose of placing the clearing function beyond the jurisdiction of the Secretary of Agriculture. 67 F. 2d at 406.

12. The trustee has not contended that charter provisions authorizing additional functions are, in practice, nugatory.

13. The reference to By-Law section numbers in this portion of the opinion corresponds to the By-Law excerpts submitted as exhibits to the Exchange's moving affidavit.

**138**

stockholders. (By-Laws § 17). Moreover, the Board of the Association is empowered to adopt rules and regulations for the conduct of business, the clearance of contracts and the handling of margin. (By-Laws § 4). The Exchange plays no part in the amendment process or in the adoption of rules and regulations.

In summary, on undisputed facts, *Wallace* is wholly distinguishable from the instant case. None of the factors which underlay the decision to attribute the conduct of the Clearing Corporation to the Board of Trade in that case is present in the instant case.

Plaintiff's contention that the Exchange should be held liable as an aider and abettor is outside the scope of the issues as defined by the opinion of May 17, 1974. The court has, however, considered the trustee's contention on the merits and rejected it.[14]

Accordingly, it is the conclusion of this court that the defendant Exchange has shown on undisputed facts that it is entitled to judgment as a matter of law. Its motion for summary judgment as to the third count of the amended complaint is granted.

So ordered.

14. In Lanza v. Drexel & Co., 479 F.2d 1277, 1303 (2d Cir. 1973), and Fischer v. Kletz, 266 F.Supp. 180, 197 (S.D.N.Y.1967), the courts of this circuit adopted the definition of aiding and abetting which appears in § 876 of the Restatement of Torts (1939). That section imposes liability where it is shown, *inter alia*, that the alleged aider and abettor gave "substantial assistance or encouragement" to the alleged principal in his violation of the law. There are *dicta* in the decisions of courts in other circuits to the effect that a *mere failure to act* to prevent the alleged principal from violating the law is sufficient. *See* Brennan v. Midwestern United Life Insurance Co., 259 F.Supp. 673, 682 (N.D.Ind.1966), 286 F.Supp. 702 (N.D. Ind.1968), aff'd, 417 F.2d 147 (7th Cir. 1969), cert. denied, 397 U.S. 989, 90 S.Ct. 1122, 25 L.Ed.2d 397 (1970). However, the law of this district and circuit appears to be

that in order to establish that the alleged aider and abettor lent "substantial assistance or encouragement," it must be shown that he took some *affirmative* action to aid the alleged principal. Fischer v. Kletz, *supra*, 266 F.Supp. at 197 (accountant took affirmative action of recommending that false figures be used in "interim" financial statements) ; *see* Lanza v. Drexel & Co., *supra*, 479 F.2d at 1302–1304; Brennan v. Midwestern United Life Insurance Co., *supra*, 417 F.2d at 154–5.

On the present motion for summary judgment, plaintiff has not presented sufficient evidence of affirmative conduct on the part of the Exchange to raise a genuine issue of material fact as to whether the Exchange lent "substantial assistance or encouragement" to the Association in its alleged violation of § 273.